Filed 12/14/16 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


FOURTH APPELLATE DISTRICT


DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | G051696 |
|     v. | (Super. Ct. No. 12ZF0128) |
| SCOTT EVANS DEKRAAI, | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
|     Defendant and Appellant. | |


It is ordered that the opinion filed on November 22, 2016, be modified in the following particulars:

On page 2, third paragraph, after the fourth sentence a footnote is added to read, "In a request to modify the opinion, the Attorney General states she did not intend to suggest the trial judge prejudged the case."

On page 38, second full paragraph, the third sentence is deleted and replaced with the following: "But at oral argument, the Attorney General conceded the record includes no evidence that before the March 2014 evidentiary hearing the OCDA asked the OCSD questions that would have elicited information about the TRED database or TRED records."

These modifications do not effect a change in judgment.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

Filed 11/22/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Appellant, | G051696 |
|       v. | (Super. Ct. No. 12ZF0128) |
| SCOTT EVANS DEKRAAI, | O P I N I O N |
|     Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Appellant.

Frank Ospino and Sharon Petrosino, Public Defenders, David Dworakowski and Scott Sanders, Assistant Public Defenders, Scott Van Camp, Deputy Public Defender, for Defendant and Respondent.

## I. Introduction

The trial court recused the entire Orange County District Attorney's (OCDA) office[1] from prosecuting Scott Dekraai's penalty phase after he pled guilty to eight counts of murder. The court did so after two evidentiary hearings where it heard from 39 witnesses over six months. The court's reasoning is detailed in an eight-page single spaced order where it concluded the OCDA had a conflict of interest with the Orange County Sheriff's Department (OCSD or deputy sheriff) that prevented the OCDA from fairly prosecuting the penalty phase. The Attorney General appeals from that ruling, arguing OCSD was to blame for the misconduct and the OCDA did not have a conflict of interest.

The sole issue is whether the trial court erred by recusing the entire OCDA's office from prosecuting Dekraai's penalty phase. We have read the extensive record and considered the relevant authorities. As we explain below, we conclude it was well within the court's discretion to recuse the entire OCDA's office from prosecuting the penalty phase because the OCDA had a disqualifying conflict of interest.

On the last page of the Attorney General's reply brief it states, "The trial court's order recusing the OCDA from prosecuting Dekraai's penalty phase trial was a remedy in search of a conflict." *Nonsense.* The court recused the OCDA only after lengthy evidentiary hearings where it heard a steady stream of evidence regarding improper conduct by the prosecution team. To suggest the trial judge prejudged the case is reckless and grossly unfair. *These proceedings were a search for the truth.* The order is affirmed.

---

[1] We refer to the elected Orange County District Attorney, Tony Rackauckas, by name. We refer to lawyers in the OCDA's office by name where appropriate or as DA, district attorney, prosecutor, or prosecution team as the context requires.

## II. Summary

Penal Code section 1424[2] grants a trial court the authority to recuse a district attorney if the evidence establishes the district attorney has a conflict of interest that is so severe it is unlikely a defendant would receive a fair trial. We review the trial court's ruling for an abuse of discretion. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712 (*Haraguchi*).)

At the first evidentiary hearing, the trial court had before it Dekraai's motions to dismiss, recuse the OCDA, and exclude his custodial statements. The basis for these motions was alleged misconduct on the part of the OCDA. Confidential informants (CIs), OCDA prosecutors and investigators, OCSD deputy sheriffs, and local law enforcement testified concerning a custodial CI program (CI program) where OCSD deputy sheriffs placed CIs near represented defendants, including Dekraai, to obtain statements, and prosecutors were aware of the CI program and either explicitly or implicitly promised CIs they would receive a benefit. There was also evidence that after DAs met with a CI and learned the CI questioned Dekraai, DAs obtained permission from OCSD to place a recording device in Dekraai's cell to obtain additional statements. OCDA prosecutors and investigators also testified their discovery practices concerning the CI program were deficient in this case and others. During the course of the hearing, the OCDA agreed it would not use Dekraai's custodial statements to a CI during the penalty phase, and Dekraai subsequently pled guilty to all charges.

At the conclusion of the first evidentiary hearing, the trial court denied the motions to dismiss the death penalty and recuse the OCDA, and ordered the OCDA could not use Dekraai's custodial statements during the penalty phase. The court reasoned that although the prosecution team committed significant, negligent misconduct in this case as evidenced by the OCDA's constitutional discovery violations and interference with

---

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

3

Dekraai's constitutional right to counsel, evidence concerning prosecutorial misconduct in other cases was not relevant in this case. The court concluded the OCDA did not suffer from a conflict of interest and the court had not lost confidence the OCDA could fairly prosecute the penalty phase.

After Dekraai filed a motion for reconsideration based on newly discovered evidence, OCSD's TRED[3] records, the trial court conducted a second evidentiary hearing. OCSD deputy sheriffs testified regarding the TRED records, which were three-line computer data entries regarding, inter alia, the reasons for classification decisions and housing movements. Two OCSD deputy sheriffs who testified at the first evidentiary hearing admitted they did not disclose the TRED records and gave conflicting reasons for the failure.

At the conclusion of the second evidentiary hearing, the trial court explained that for a decade OCSD maintained the TRED database where it documented inmate housing movements and deputy sheriffs accessed the database on a daily basis. The court opined the two OCSD deputy sheriffs were not credible and concluded evidence concerning prosecutorial misconduct in other cases was now relevant in this case. The court reasoned that although there was no evidence the OCDA knew of or concealed the TRED records, their recent disclosure demonstrated the OCDA's "benign neglect" resulted in a violation of Dekraai's constitutional and statutory rights. The court concluded that based on the TRED records and the other evidence it heard during the first and second evidentiary hearings, the OCDA had a conflict of interest with the OCSD and it had lost confidence the OCDA could fairly prosecute Dekraai's penalty phase. The court granted the motion to recuse the entire OCDA's office from prosecuting the penalty phase and ordered additional evidentiary sanctions.

---

[3]     The record includes no explanation about what the acronym TRED means.

4

As we explain below, we conclude the trial court did not abuse its discretion when it recused the entire OCDA's office from prosecuting the penalty phase. There was substantial evidence to support the court's conclusion the OCDA's institutional relationship with the OCSD constituted a conflict of interest that prevented the OCDA from fairly prosecuting the penalty phase. The court's conclusion the OCDA's institutional relationship with the OCSD prevented it from supervising its law enforcement team was a conflict of interest well established in law. Further, the court's exercise of its discretion, that based on the entire factual record before it, the OCDA's conflict of interest was so grave that it was unlikely Dekraai would receive a fair penalty phase, was within the permissible range of options provided by section 1424.

"[W]e must rely on our prosecutors to carry out their fiduciary obligation to exercise their discretionary duties fairly and justly—to afford every defendant, whether suspected of crimes high or petty, equal treatment under the law." (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 734 (*Hollywood*).) "The first, best, and most effective shield against injustice for an individual accused, or society in general, must be found not in the persons of defense counsel, trial judge, or appellate jurist, *but in the integrity of the prosecutor*." (Corrigan, On Prosecutorial Ethics (1986) 13 Hastings Const. L.Q. 537, italics added.)

III. Facts

*Offenses & Custodial Events*

Dekraai entered a hair salon in Seal Beach armed with three handguns. He shot eight people, seven of whom died, including his ex-wife. After he left the salon, Dekraai fatally shot a man who was sitting in his vehicle in the parking lot. Minutes later law enforcement officers stopped Dekraai in his truck and arrested him. Seal Beach detective Gary Krogman interviewed Dekraai the same day.

OCSD deputy sheriffs placed Dekraai in the Orange County (OC) jail, module L, sector 19, cell 13. Deputy sheriffs moved Fernando Perez, a CI who had been

5

in module L, sector 17 since the previous month, from cell 3 to cell 1. Around the same time, deputy sheriffs moved Dekraai, who was represented by retained counsel at the time, to sector 17, cell 3, next to Perez. Perez befriended Dekraai, and Dekraai made incriminating statements to him. Perez wrote down Dekraai's statements and gave them to a deputy sheriff in OCSD's special handling unit (SHU).[4] The SHU deputy sheriff called an OCDA investigator who notified prosecutors Dekraai spoke to Perez. Assistant DA Dan Wagner and Senior Deputy DA Scott Simmons, OCDA investigator Robert Erickson, and Krogman met with Perez in the jail. After speaking with Perez, the prosecutors obtained OCSD's approval to place a recording device in Dekraai's cell. Dekraai made additional statements to Perez for about a week until Dekraai was moved to another facility. Just before he was moved, the OC Public Defender (OCPD or PD) was appointed to represent Dekraai.

Perez and another inmate, Oscar Moriel, worked as CIs in "Operation Black Flag" (Black Flag), a federal/state task force led by the Santa Ana Police Department (SAPD) to combat criminal gang activity in OC. Assistant United States Attorney (AUSA) Terri Flynn-Peister was to prosecute the federal cases, and Deputy DA Erik Petersen was to prosecute the state cases. The primary case agents were FBI agent Anthony Garcia, OCSD deputy sheriff Seth Tunstall, and SAPD detective Gonzalo Gallardo. Black Flag was scheduled to culminate in July 2011 with the filing of indictments.

*Procedural History*

A complaint, filed in October 2011, and an indictment, filed in January 2012, charged Dekraai with eight counts of murder (§ 187, subd. (a)), and attempted murder (§§ 664, subd. (a), 187, subd. (a)), and alleged the multiple murder special

---

[4]    At the Orange County jail there was an intake and release center where about 28 deputy sheriffs worked in the classification unit and within that unit about four deputy sheriffs worked in the SHU.

circumstance (§ 190.2, subd. (a)(3)), and a firearm enhancement (§ 12022.53, subd. (d)). In October 2012, the DA declined to produce information concerning Perez because it did not intend to call him as a witness; it had already produced the jail recordings. In January 2013, the trial court granted Dekraai's motion to compel discovery regarding Perez. Over the following months, the DA provided voluminous discovery.

In early 2014, Dekraai filed the following motions: (1) a nonstatutory motion to dismiss the death penalty based on outrageous governmental conduct; (2) a motion to recuse the OCDA pursuant to section 1424 and the due process clause; and (3) a motion to exclude his custodial statements pursuant to *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*) [prosecution may not use evidence obtained in violation of Sixth Amendment right to counsel]. The motions were supported by a declaration from Assistant Public Defender Scott Sanders, Dekraai's trial counsel. The prosecution opposed the motions, supported by a declaration from Wagner, the head of the OCDA's homicide unit. The Attorney General opposed recusing the OCDA.

*First Evidentiary Hearing—March to July 2014*

At the outset of the hearing, the trial court indicated it had read the motions, declarations, and exhibits and it concluded Dekraai made a prima facie showing requiring an evidentiary hearing and it would consider the motions jointly. The court heard testimony from 36 witnesses, only some of which we discuss here.

Perez, a CI with two active cases being prosecuted by DA Petersen, testified about his life in custody. As relevant here, Perez emerged as a shot caller in the Mexican Mafia after a power struggle for control of the OC jails. When Perez's faction lost power and he became vulnerable, he had an "awakening" and contacted Benjamin Garcia, who worked in the SHU. In summer 2010, Perez "debriefed" with Garcia and deputy sheriff William Grover, who also worked in the SHU, and began providing them information on the Mexican Mafia. In January 2011, after meeting with Tunstall, who also worked in the SHU, detective Gallardo, and FBI agent Anthony Garcia, Perez signed

7

a CI agreement. During 2011, Perez was a CI providing information on the Mexican Mafia to Garcia, his primary personal handler. When Perez received information, he would notify one of his handlers and write down the information, and a deputy sheriff would pick up his notes. Perez testified that from the outset he was told he could not question inmates but if an inmate told him something, he could write it down.

Perez testified he became a CI because it was the right thing to do, but he hoped his work would be taken into consideration in his prosecution. He added no one promised him anything. Perez claimed he did not question anyone or ingratiate himself with inmates to get them to discuss their cases, although he acknowledged he had an incentive to be a CI because he faced two life sentences. Perez stated inmates confided in him because he was a Mexican Mafia shot caller who could be trusted. When Perez was asked about his notes indicating he questioned inmates or arranged to have inmates Leonel Vega and Abel Perez housed near him, he could not remember. Perez admitted he asked Garcia for a fake validation packet, a notice indicating a person is a Mexican Mafia member, which would enhance his credibility.

Perez also provided information on numerous inmates, including the following: Daniel Wozniak, who PD Sanders also represented, confessed to Perez he killed and mutilated two people; Vega, a Delhi gang member who was charged with special circumstance murder and was represented by counsel, was a Mexican Mafia member who provided information to Perez; Isaac Palacios, a Delhi gang member who was charged with two counts of special circumstance murder and was represented by counsel, confessed his crimes to Perez; and Fabian Sanchez, a Delhi gang member who was charged with attempted murder and was represented by counsel, confessed to Perez and implicated himself in another homicide.

Perez testified he had befriended Dekraai, and Dekraai confessed to him. As he had done with other inmates who he was informing on, Perez regularly checked on Dekraai and helped him adjust to life in custody, showing him how to bathe in his cell

8

and heat food, and giving him various items. When his recollection was refreshed with a transcript of the jail recordings, Perez agreed he asked Dekraai whether he used drugs; this was after Perez met with the prosecution team. Perez wrote down what Dekraai told him and gave it to Garcia. At the October 19, 2011, meeting, Perez initially told DA Wagner, DA Simmons, DA investigator Erickson, and detective Krogman he did not ask Dekraai questions but later admitted to them that he told Dekraai to explain what happened. They told Perez to listen to Dekraai and write down what he said but that he could not ask Dekraai any questions.

Wagner testified he had been a prosecutor for 20 years and was one of the DAs prosecuting Dekraai.[5] Wagner described his employment history with the OCDA and how he came to head the homicide unit. Wagner agreed he had trained attorneys but he could not recall if any programs involved *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) [prosecution duty to disclose to defendant material exculpatory evidence], and none of the trainings involved *Massiah* or CIs.

Wagner testified regarding the prosecution's efforts to obtain Dekraai's psychological records. While watching Krogman's interview with Dekraai, Wagner learned Krogman obtained a medical waiver from Dekraai prior to him being represented by counsel. On October 17, Wagner, Simmons, and Erickson drove to Dekraai's psychiatrist's office. When they entered the office, staff gave them the name and telephone number of the doctor's attorney, Joel Douglas. Erickson called Douglas, who told him that he would produce the records when he received the waiver. They sent the waiver to Douglas, and Erickson called him. Douglas stated the waiver was invalid because it did not specify psychological and substance abuse records and Erickson had to obtain a new waiver. Later that day, Krogman learned the waiver was invalid and went to the jail and tried to get Dekraai, who was now represented by counsel, to sign a new

---

5          The parties stipulated the trial court could consider Wagner's declaration.

waiver, but he refused. Wagner denied anyone from the OCDA's office told Krogman to try to obtain a new waiver. When Wagner was asked whether he was frustrated with Krogman's conduct, he said Krogman was "bound by different ethics than I am." Later, pursuant to a lawfully obtained search warrant, but contrary to a subsequent court order prohibiting seizing the records until resolution of Dekraai's motion to quash the search warrant, Krogman seized the records; no one for the prosecution team inspected the records, and they remain under seal.

Wagner testified about the prosecution team's meeting with Perez on October 19, 2011. Wagner admitted his knowledge of *Massiah* was limited. Wagner did not know Perez and did not research his background before meeting him but thought he was a "jailhouse informant." Deputy sheriff Garcia met the prosecution team, showed them Perez's notes, and took them to a room where Perez and another deputy sheriff were seated. Erickson told Perez that they would appreciate him sharing any information he heard about the Seal Beach shootings but not to expect anything in return. After Perez said he understood, Erickson activated his recording device. During the interview, Perez repeated he understood they were not promising him anything in return for his information. Erickson asked Perez how his conversation with Dekraai began. Perez stated he asked Dekraai what happened and when Dekraai asked him if he really wanted to know, Perez told him to explain what happened. The recorded interview was brief.

Wagner left the meeting thinking Perez was a gang member and jailhouse informant. Because Wagner did not intend to call Perez as a witness, he and DA Simmons "discussed whether and how it might work to capture Dekraai on tape if he continued to speak about the crime." After an OCSD captain approved their request to place a recording device in Dekraai's cell, they asked Garcia to remind Perez to not initiate any conversation with Dekraai about the shootings. After the interview, Wagner did not investigate Perez or his background as an informant.

10

In late 2011, Erickson asked and Wagner approved of Erickson notifying Perez's prosecutor, whose identity Wagner did not know, that Perez provided information on the Dekraai case. When Wagner read Erickson's November 2011 memorandum to DA Petersen, which he claimed was two years later, he cringed when he read the following: "As the prosecutor handling Perez's case, this memorandum is being directed to you for your consideration and information only." Wagner believed "consideration" referred to continued benefits while in custody and not a reduced sentence, and he did not approve conferring any benefit to Perez for his information.

Wagner testified that in February 2012, after he read Erickson's report regarding the October 2011 meeting with Perez and Krogman's report concerning Dekraai's recorded statements, he approved disclosing the information to Dekraai while concealing Perez's name to protect him. This information, and Perez's notes concerning Dekraai, were produced to Dekraai in April 2012; it was the first discovery regarding Perez. The reports do not include any information about Perez's prior work as a CI.

In April 2012, Wagner asked Erickson to run Perez's "rap sheet" to determine if the OCPD had previously represented Perez. Wagner learned Perez faced a life sentence, the name of his defense counsel, and likely that Petersen was prosecuting his cases. Wagner did not intend to call Perez as a trial witness, but he knew it was likely Perez would have to testify at a *Massiah* hearing.

In June 2012, Wagner e-mailed Erickson to ask him about which cases Perez was working on as a CI, and Erickson directed him to Petersen. Wagner admitted he had information Perez was working on "some other case[,]" but he did not "recall having [the] thought process[]" that Perez's work as a CI needed to be shared with defendants other than Dekraai. Wagner believed he first spoke to Petersen about Perez between June 2012 and January 2013.

In October 2012, PD Sanders sent Wagner an informal discovery request concerning Perez and his CI work. Wagner replied the OCDA had already produced

11

recordings in July 2012, and he declined the request because he did not intend to call Perez as a trial witness.

In January 2013, Sanders filed a formal discovery motion concerning Perez's CI work. Wagner opposed the motion. In his opposition, Wagner stated he had disclosed all *Brady* material, and included a declaration in which he stated Perez was not going to receive any benefit for providing information in the Dekraai case. The following week, Wagner sent DA Petersen and deputy sheriff Tunstall an e-mail asking how much CI information there was and how long it would take to collect it. A couple days later, Petersen replied there were eight "State Black Flag" cases and one homicide case. The next day, the trial court granted Dekraai's motion to compel discovery.

Wagner admitted that after the trial court's ruling, he realized his understanding of *Massiah* and *In re Neely* (1993) 6 Cal.4th 901 (*Neely*) [Sixth Amendment violation where informant acted on police behalf based on preexisting agreement with expectation of benefit and deliberately elicited statements from defendant], were flawed. However, he stated his "'withholding' of '*Brady* material,'" as alleged in Dekraai's informal discovery request, was not intentional but rather was because of his "failure to predict" the defense's "creative applications" of *Massiah* and failure to evaluate "the subtleties of the *Massiah* motion which had not yet been filed." The DA produced 5,490 pages of documents and 45 DVDs, including Perez's CI file and information regarding nine gang cases. Additional materials were produced in the following months, including Erickson's November 2011 memorandum to Petersen mentioning "consideration." Wagner read some of the material and skimmed the information on the nine gang cases.

Around the same time, Wagner e-mailed Ben Masangkay, the OCDA CI index coordinator, requesting Perez's CI file. Wagner stated Perez's CI file did not

contain any notes indicating Perez worked as a CI on inmates Dekraai, Wozniak, or Sanchez, which he explained meant no request for consideration had been made.[6]

Wagner testified about his review of Dekraai's motions and his subsequent investigation of the contentions made therein vis-à-vis this case and to a lesser extent the nine gang cases. Wagner stated he had investigated the claims that members of the SHU and/or SAPD placed CIs next to represented defendants to obtain statements. Wagner, Simmons, Erickson, and Krogman interviewed DA Petersen, detective Gallardo, and deputy sheriffs Garcia and Tunstall in March 2013.[7] He could not remember many of the details of these interviews, including whether he asked the interviewees if they were aware of moving CIs. Wagner remembered Tunstall stating Perez obtained information from an inmate not associated with the Mexican Mafia, Palacios, but he did not remember following up. He also remembered Garcia stating OCSD housing records indicated a jail nurse moved Dekraai to module L, sector 17, cell 3.

In May 2013, Wagner, Simmons, and Erickson interviewed Gallardo. Again, Wagner could not remember many details of the interview. At the meeting Wagner asked Gallardo whether he ever directed Perez to obtain statements from defendants who were charged with murder but not connected with the Mexican Mafia. Gallardo replied the following: "'There were, there were -- there was times we did. We did use informants and we -- basically under the direction of a district attorney we would use inmates.'" When confronted with the interview transcript, Wagner gave inconsistent answers about this exchange.

---

[6]      Masangkay, who had trained SHU deputy sheriffs on the CI index, later testified a literal reading of the OCDA's policy only required an entry in the CI's file if the CI received a benefit.

[7]      During Wagner's testimony, the trial court ordered the discovery of all notes from each of the interviews. The DA later produced about 130 pages of material.

Within weeks of receiving Dekraai's motions in early 2014, Wagner spoke first with his supervisor, Senior Assistant DA Jim Tanizaki, and then with DA Rackauckas about the motions. Wagner admitted that before he had read the entire motion to dismiss he made public comments the motion included "scurrilous allegations" and "untruths." Wagner also stated the Sanders' allegations were "'commonplace'" and "'part of their normal litigation strategy.'" Wagner said that after he read the entire motion he had a "begrudging respect" for Sanders' work on the gang cases, but he failed to acknowledge any wrongdoing in the Dekraai case. Wagner admitted there was "a lot of anger inside [him]" regarding Sanders' allegations and the anger was pervasive in the DA's office, including "many" in the 15-person homicide unit.

Simmons, OCDA senior deputy DA, testified he had been a prosecutor for 24 years and was the other DA prosecuting Dekraai. Simmons knew there were jail informants, but he was unaware SHU deputy sheriffs worked with them. As to the October 19, 2011, meeting, Simmons stated no one tried to learn anything about Perez. Simmons did not remember hearing Perez had previously provided reliable information. Simmons was skeptical Perez was providing information for purely altruistic reasons, but he did not suspect Perez was a CI in other cases until he saw Perez's notes weeks later. Simmons had a basic understanding of *Massiah* and although he knew Perez asked Dekraai questions, he did not think they should stop the meeting because he did not think Perez was a government agent. Immediately after the meeting, they decided to not use Perez as a trial witness and instead placed a recording device in Dekraai's cell. Simmons learned the extent of Perez's CI work in late 2012 or early 2013.

Simmons stated the first time he saw Erickson's November 2011 memorandum to Petersen, which he did not instruct Erickson to write, was shortly before it was produced to the defense in September 2013. Simmons said he has a better understanding of *Massiah* and *Neely* and now believes the memorandum and information about Perez's CI work should have been produced in response to Dekraai's informal

14

request for discovery. He attended a training on CIs many years ago, one training regarding *Brady* within the last 10 years, and no training on *Massiah*. Simmons did not consider making an entry in Perez's CI file for his work on Dekraai because he shared Wagner's understanding concerning when to make a notation in a CI file.

Erickson testified he was previously an OCDA investigator who worked with Simmons on the Dekraai case. Erickson knew SHU deputy sheriffs worked with CIs and he "may have" previously spoken with deputy sheriff Garcia about CIs. He also knew Perez had previously provided reliable information before the prosecution team met with him at the jail. Both before and after recording, Erickson told Perez that they were not making him any promises in return for his information, and Perez stated he was not seeking anything. After the interview, and after Garcia gave him Perez's notes regarding Dekraai on November 1, 2011, Erickson believed Perez had done a "comfortable amount of work" as a jail informant. Erickson gave Perez's notes to detective Krogman.

Erickson testified concerning his November 2011 memorandum to Petersen. Someone told him to write the memorandum but he could not remember who it was. He was "quite certain" is was not Wagner or Simmons, but he would have sought their approval. When Erickson was asked what he meant when he wrote a "covert investigation" in the jail demonstrated Perez's information was reliable, he stated he was referring to the meeting with Perez and Perez's notes. Erickson explained that when he said "consideration" he meant "careful thought and contemplation" rather than "actual consideration." He added the purpose of the memorandum was "basically" to make Petersen aware Perez provided information.

Erickson stated he wrote a report regarding the October 19, 2011, meeting with Perez a couple months after the meeting. Erickson did not include information that Perez had previously provided reliable information, and he did not recall any prosecutor telling him to include that information after they reviewed the report.

15

Krogman, a 27-year veteran of the Seal Beach Police Department, testified he was the lead detective in the Dekraai case. Krogman interviewed Dekraai the day of the shootings and obtained a medical waiver. After he learned attorney Douglas would not accept the waiver because it did not specify psychological records, Krogman prepared a new waiver and went to the jail to have Dekraai sign it. Krogman knew Dekraai was represented by counsel, and he was "vaguely" familiar with *Massiah*, but he was not concerned because he did not plan to interrogate Dekraai and he had already signed a waiver. Krogman stated no one from the OCDA's office instructed him to have Dekraai sign another waiver. Krogman learned Perez previously provided reliable information the day the prosecution team met with him. One week later, Krogman obtained a CD of the recordings from Dekraai's cell. Several weeks later he listened to the recordings and prepared a report detailing some of the recordings. He obtained Perez's notes regarding his conversations with Dekraai on November 9, 2011.

Moriel, a CI housed in a federal facility serving time on another case, testified he was facing a couple life sentences in a 2005 gang related attempted murder case prosecuted by Petersen. Moriel, a high-ranking member of the Delhi gang, explained that in 2009, while he was in OC jail, he decided to turn his life around and he spoke with deputy sheriffs Garcia and Grover about becoming a CI. In February 2009, he met with Garcia and detective Gallardo and told them about two murders and that he knew who committed them.[8] Moriel withheld information first because he wanted immunity and then because he wanted a deal. Like Perez, Moriel wrote down information and gave it to SHU deputy sheriffs. He said SHU deputy sheriffs never told him there were inmates that he could not talk to or to stop talking to inmates. Moriel

---

[8]        In one of the interviews, Moriel stated he wanted a deal in exchange for information and that his memory about the crimes would depend on whether or not he received a deal.

16

provided information on a couple dozen cases where he did not write any notes and he provided written notes on at least two cases that were not recorded in his CI file.

Moriel testified about Vega, a Delhi gang member and Mexican Mafia associate, who was charged with special circumstance murder. He and Vega were housed near each other both in disciplinary isolation and in module L. Moriel admitted he asked for, and Gallardo provided, a validation packet to convince Vega that he was not a CI. He initially claimed Vega told him about his pending case without asking him any questions. He said that during a subsequent conversation, Vega confessed to him. Moriel admitted that during this conversation he did question Vega. The same day, Moriel wrote Garcia a note about a previous conversation with a detective and Grover regarding moving Palacios. Despite his initial denials, Moriel eventually admitted his note indicates the plan was to obtain a confession from Palacios like he did Vega.

Finally, Moriel testified regarding Amaury Luqueno and Sergio Elizarraraz. Moriel told Gallardo that Luqueno told him an off-duty police officer shot at him and Elizarraraz. Days later, Elizarraraz was moved into Moriel's unit. Not long after, Moriel obtained confessions from Elizarraraz about various crimes.

Susan Kang Schroeder, OCDA chief of staff, testified Rackauckas is her direct supervisor. Schroeder is authorized to make public comments about high profile cases, and when she does, it is the OCDA's official position. Schroeder's review of the motions to dismiss and recuse consisted of the two paragraphs that concerned her. Schroeder told one local news outlet the DA's office understood the frustration of the victims' family members, and "'we're frustrated the defense keeps up with delay tactics.'" She told another local news outlet the motions were "on the checklist of things to do[,]" and "'they'll lose and we'll do the trial[.]'" Schroeder stated the motions had no merit because Wagner, who she described as one of the best prosecutors in the OCDA's office, said the motions were meritless.

17

After Schroeder testified, the OCDA conceded the *Massiah* motion and stated it would not use Dekraai's statements to Perez in its penalty phase case-in-chief.[9] The OCDA argued that evidence concerning other cases, which the trial court previously characterized as Evidence Code section 1101 evidence, was not relevant to the other two motions and further testimony from DA Petersen and others should be limited. Dekraai accepted the concession, but contended the evidence was relevant to the dismissal and recusal motions. The trial court accepted the DA's concession on the *Massiah* motion and explained that although it may at some point narrow the scope of the testimony concerning other cases, the court opined the "[Evidence Code section] 1101-type evidence" was admissible subject to Evidence Code section 352. Testimony continued.

Petersen, an experienced OCDA deputy DA, testified he was assigned to the TARGET unit, the tri-agency gang enforcement team, and was housed in the SAPD from 2009 to 2013. Petersen had a heavy caseload with voluminous discovery. Petersen's investigator and paralegal, who he shared with other prosecutors, assisted him with discovery. Petersen agreed that because of his heavy caseload, he did not review all cases for discovery material before it was produced, got "up to speed" when defense counsel announced ready, and hoped all the discovery had been produced.

Petersen learned of Black Flag in 2010. Deputy sheriff Tunstall asked Petersen if he was interested in prosecuting some of the defendants after they learned the defendants could receive more prison time in state court than in federal court. Petersen was assigned the Vega case and the Moriel case in October 2010. When he retrieved the discovery from the previous prosecutor, he said there was no outstanding discovery.

---

[9] Weeks later, a prosecutor qualified that concession, stating whether there was an actual *Massiah* violation was arguable. And later in supplemental briefing, the same prosecutor said he conceded the *Massiah* motion "for practical reasons" and it was "*not* an admission of wrongdoing."

18

Petersen knew Moriel was a federal informant, but he did investigate the extent of his CI work even after he heard Moriel testify about his extensive CI history. Petersen produced Moriel's notes regarding Vega's confession, which were dated August 1, 2009, and consisted of four pages, to Vega's defense counsel. Petersen admitted he did not produce other relevant discovery to Vega, and to another defendant who Vega's defense counsel also represented. At the time of Vega's trial, Petersen was only aware Moriel provided information regarding Vega, Palacios, and Elizarraraz. Petersen never asked Moriel or Tunstall how Moriel came to be housed next to Vega. Petersen testified he had never seen OCSD's log detailing Moriel's CI work and he did not know the SAPD conducted three recorded interviews with him in 2009.

When Petersen read the motion to dismiss, it was the first time he learned of "coincidental contact" between CIs and targeted defendants and that he did not produce to defense counsel a significant amount of Moriel's notes. Petersen also learned he produced different quantities of notes in Black Flag cases—four pages to Vega and 196 pages to another defendant. Petersen admitted there was "discovery that was not" produced, but he stated it was not intentional. He believed AUSA Flynn-Peister decided what information could be released. He conceded his understanding of *Brady* was "evolving" as he reads more cases.

While prosecuting the Perez case, Petersen did not know Perez obtained information from Dekraai until either Wagner or Erickson told him. When he received Erickson's November 2011 memorandum, he did not consider how it affected Perez's case but he intended to give it to Perez's defense counsel. Petersen did not recall whether Wagner told him Perez was not to receive any consideration for providing information in the Dekraai case. However, Wagner said he would tell the sentencing judge what Perez did and he would recommend less than a life sentence in one of Perez's cases.

Gallardo, a former SAPD detective, testified that in 2003 he was assigned to the career criminal unit, a federal task force designed to dismantle criminal street

19

gangs. Gallardo admitted that a few days before his testimony he met with DAs about his May 2013 interview with DAs. Gallardo testified he misspoke at that interview when he told Wagner that DAs directed him to obtain statements from murder suspects. Gallardo said it was under Flynn-Peister's direction. Gallardo realized his mistake during his meeting with DAs a few days earlier "[w]hen it was brought to [his] attention." Gallardo claimed it was a simple mistake he attributed to the fact he was working with the DA and the interview was in the DA's office. Gallardo stated he had to get approval from Flynn-Peister or a FBI agent before disseminating information. He added, however, that after July 2011, all CI notes were released to detectives.

Gallardo testified that during the May 2013 interview he was telling the truth when he said SHU deputy sheriffs would put Perez or Moriel next to a murder suspect to obtain statements. SHU deputy sheriffs were responsible for moving CIs near targeted defendants but he did not know how it was documented. Gallardo thought he heard discussions between Garcia and SAPD officers about moving CIs near targeted defendants. He learned there was a plan to put Moriel and Vega together in disciplinary isolation. Gallardo initially said he believed Garcia gave Moriel fake paperwork but later said he did not know whether that happened.

After Gallardo testified, Dekraai pleaded guilty to all counts and admitted the special circumstance and firearm enhancement allegations.

Tunstall, a 15-year OCSD deputy sheriff, testified he was assigned to the SHU from 2002 to 2010, when he was assigned to the federal task force. As a member of the task force, his office was at the SAPD, but he had weekly contact with SHU deputy sheriffs. In the last couple years Tunstall had received training from the OCDA regarding CIs but not from the OCSD. He had not been trained on *Massiah* but knew CIs cannot question represented defendants about charged crimes. Tunstall instructed CIs to write down information they received from inmates but not to question inmates about charged crimes. If he learned a CI was eliciting information, he would instruct the CI to

20

stop; however, he was not aware of that happening. He met with both Perez and Moriel while they were working as CIs.

Prior to testifying, Tunstall read the motion to dismiss and reviewed Perez's and Moriel's CI notes. He testified he had no information OCSD deputy sheriffs moved CIs near charged defendants to elicit statements. But Tunstall admitted he once tried to have an inmate moved to obtain statements but it did not happen. He acknowledged that when he worked in the SHU at Theo Lacey jail, Gallardo told him Vega was moved from Theo Lacey jail to OC jail so Moriel could obtain statements from Vega about the Mexican Mafia. Tunstall stated that had he known Moriel questioned Vega, he would have told Petersen, but he did not believe that happened.

Tunstall reviewed Moriel's August 1, 2009, four-pages of notes detailing Vega's confession before he testified at Vega's trial. When confronted with the notes, Tunstall admitted the first time Vega confessed to Moriel was after Moriel told Vega to tell him what happened. Although Tunstall initially stated he did not have an obligation to produce Moriel's notes, he later said he would have notified someone had he known but he only "briefly" reviewed Vega's notes before trial. Like DA Petersen, Tunstall blamed the United States Attorney's office and the FBI for the discovery lapses. Tunstall added that although he had a complete copy of Perez's and Moriel's CI notes, he was not allowed to give Petersen the notes until after the Black Flag operation in July 2011. He gave contradictory testimony about whether he ever gave Petersen all the CI files.

Tunstall was interviewed by DAs Wagner and Simmons in March 2013. When confronted with the interview transcript, Tunstall claimed he misspoke when he said he was involved in moving Perez near Mexican Mafia "targets" to obtain statements. He said there was only one target, Ronald Melendez.

Tunstall was questioned about OCSD housing records concerning inmates Perez, Moriel, Dekraai, and Palacios. He repeatedly stated he did not know why they were moved. When Tunstall was asked whether inmate movements were documented in

21

any OCSD reports, he answered the following: "No, they wouldn't be. It would just be in the housing records." When Tunstall was asked how defense counsel would know an inmate was moved near a CI, Tunstall replied, "I do not know that answer."

Garcia, a 12-year OCSD deputy sheriff, testified he worked in the SHU for about 11 years before being transferred to the task force in July 2013. Garcia explained SHU deputy sheriffs work with CIs from the federal task force but do not have their own CIs. Garcia said CIs were inmates who signed CI agreements and not those that simply provided information. Ever since being at the police academy Garcia knew CIs cannot question a defendant about charged crimes.

Garcia read portions of the motion to dismiss regarding him intentionally moving CIs and inmates to obtain statements. He admitted that pursuant to orders from the federal task force, CIs were moved to try to obtain statements from Vega and Palacios regarding the Mexican Mafia. He gathered notes from CIs, summarized them, and gave them to the task force. Garcia repeatedly said he did not believe he ever wrote a report or documented movements of CIs and inmates near each other to obtain statements.

PD Sanders played an audio recording of a July 2009 meeting between CI Moriel, deputy sheriff Garcia, another SHU deputy sheriff, and a SAPD detective. Garcia agreed that during the recording the detective stated Moriel would get "'maximum consideration'" for providing information and Moriel had to sign a document the detective assured him would remain confidential. Garcia did not remember what was said during the meeting because he was working on the computer.

Garcia first met Perez in June 2010. Perez had written his life story, and either he or deputy sheriff Grover asked Perez to write down the names of all the gang members he knew. Garcia told Perez to write down any information he received, and Garcia would collect the notes, which Garcia later summarized. Garcia initially stated Perez provided information because he thought it was the right thing to do, but later acknowledged Perez asked whether he would receive a benefit. After reading Perez's

22

notes about Wozniak, Garcia admitted he was concerned Perez asked him about the charged crime but he could not remember whether he spoke with Perez. Garcia could not recall speaking with Perez about questioning inmates.

Garcia was asked how Dekraai and Perez were housed next to each other in module L, a module reserved primarily for inmates with special needs. Garcia explained Perez was housed in sector 17, cell 3 for protective custody awaiting transfer to a federal facility; this cell had the best visibility from the guard and nursing stations. The medical unit initially placed Dekraai in sector 19 for acute observation; the medical unit can place an inmate with medical issues without the SHU's approval. Two days later, nurse James Trimmer, with the OC Health Care Agency, completed paperwork to move Dekraai to sector 17, cell 3, Perez's cell.[10] Garcia stated a module L deputy sheriff who was not part of Black Flag and who would not have known Perez was a CI moved Perez into the sector 17, cell 1, the adjoining cell.

Garcia testified that when Perez told him that he spoke with Dekraai, he notified Erickson and Krogman. Garcia could not recall whether he told anyone from the DA's office or Krogman about Perez's work as a CI, but there was no reason he would have withheld that information. Garcia was asked a number of questions regarding OCSD's housing records and the housing of specific inmates, including Perez and Moriel. Garcia claimed not to know why an inmate was moved in the jail.

Flynn-Peister testified she was an AUSA until the end of 2012 when she was appointed to the OC Superior Court. After discussing the details of Black Flag, Flynn-Peister stated she knew Perez and Moriel were CIs for the operation and she gave

---

[10] Trimmer testified the decision to move Dekraai to sector 17, cell 1 could have been his, medical staff's, or classification's, but he could not remember. He stated the move was in Dekraai's best medical interest. Trimmer stated he could not move an inmate who was in module L for a non-medical reason without permission from someone in the classification unit.

23

case agents legal advice on how to properly use them. She was not involved in the operational details of the investigation, did not direct case agents to move CIs and inmates near each other, and denied she provided questions for the CIs to ask inmates. She knew Perez and Moriel were obtaining information and writing notes, but she did not review the notes until 2011.

Flynn-Peister stated that when she learned case agents planned to use Moriel as a CI, she was concerned about the potential Sixth Amendment issues. She wrote a memorandum on how to properly use him and to notify her if Moriel obtained information from an inmate about a charged crime. During 2010 and 2011, she could remember only one inquiry.

Flynn-Peister spoke with case agents about protecting the integrity of Black Flag, but she never told case agents to withhold information from defendants, the OCDA, or local law enforcement and she was not asked if Moriel's and Perez's notes could be disclosed. Flynn-Peister testified she and DA Petersen had equal access to the operation's investigation materials with the exception of federal materials.

Later, the trial court questioned Flynn-Peister. The court read the portion of Petersen's testimony where he stated Flynn-Peister deliberately withheld discovery from him. The court asked Flynn-Peister whether she remembered telling any case agent to give the local prosecutor only four pages and nothing more. She said, "No." When the court asked whether it was possible she was not remembering, she said, "No."

Deputy sheriff Tunstall was recalled. Tunstall testified Flynn-Peister authorized him to give Petersen only four pages of Moriel's notes.[11]

---

[11]     PD Sanders offered the testimony of a number of witnesses from the DA's office and local law enforcement. Much of this testimony concerned cases where Moriel provided information, and some of it concerned the DA's training policies regarding CIs, investigation of Sanders' allegations, and preparation of its responsive papers. Sanders also recalled several witnesses, some a couple times, to clarify testimony or revisit issues raised by other witnesses' testimony. We need not recount all that testimony here.

24

*Trial Court's First Ruling*

After counsel presented argument, the trial court took the matter under submission. At a hearing the following week, the trial court issued its 12-page written ruling, portions of which it read into the record. The court explained the broad scope of the evidentiary hearing was necessary to allow it to determine whether "<u>in this case</u>" law enforcement engaged in outrageous government conduct and whether the OCDA should be recused from prosecuting the penalty phase, and not to fashion a global remedy based on evidence about other cases.

The trial court first addressed the outrageous government conduct motion. The court stated Dekraai's motion was in large part based on discovery violations pursuant to *Brady, supra,* 373 U.S. 83, and interference with his right to counsel pursuant to *Massiah, supra,* 377 U.S. 201. The court said that prosecutors during their testimony and final argument admitted that for various reasons there were "*Brady* violations, or 'errors'" in this case and others. (Underscore omitted, italics added.) The court found unpersuasive the DA's justifications, i.e., misunderstanding of the law, heavy caseloads, uncooperativeness of federal authorities, and failure to anticipate defense strategy.

After discussing at length *Brady* and *Massiah* and their progeny, the trial court stated the DAs' testimony and training materials suggest they were *familiar* with constitutional discovery rules. The court opined substantial evidence supported the conclusion there were a number of *Brady* violations, including that one DA took a "'hands off'" approach to the discovery process and law enforcement made express or implied promises to CIs.

The trial court stated some issues required a hybrid analysis implicating both *Brady* and *Massiah*. The court explained OCSD deputy sheriffs, frequently at outside law enforcement agencies' request, intentionally moved CIs and targeted inmates to obtain statements. The court said law enforcement "seldom, if ever," documented the movements and thus, "little or no information" was produced to defense counsel. The

court opined substantial evidence supported the finding CIs requested and received false documentation from OCSD deputy sheriffs to increase their credibility with targeted inmates. The court concluded *Brady* required DAs to produce this information to defense counsel to investigate possible *Massiah* violations.

However, the trial court explained the evidence before it demonstrated that "it [was] more likely than not" law enforcement did not intentionally house Dekraai and Perez in adjoining cells and "independent events" brought them both to module L. The court opined that nevertheless the question remained whether the OCDA and law enforcement engaged in subsequent misconduct.

The trial court focused on the prosecution team's meeting with Perez. The court asked why the prosecution team, after learning Perez "'provided reliable information on prior occasions,'" did not seek more information regarding Perez's background and why did Garcia not provide this information when the prosecution team failed to inquire. The court wondered whether these failures were intentional or negligent and whether the OCDA discharged its constitutional obligations. The court reasoned "[l]aw enforcement was well aware" Perez was an effective, independent CI and he would do anything to avoid having to serve a life sentence. The court said that despite Perez's denials, the evidence demonstrated Perez did for law enforcement what he had done before—ingratiated himself with Dekraai to obtain incriminating statements. The court rejected the OCDA's assertion it was not responsible for Perez's action because law enforcement repeatedly told him not to question Dekraai but only to listen and report. The court opined the "historical 'course of conduct'" established Perez was working on law enforcement's behalf when he spoke with Dekraai.

In addressing whether the DAs' misconduct was negligent or rose to outrageous government conduct, the trial court cited to Wagner's January 2013 declaration wherein he stated the prosecution team made Perez no promises of leniency. The court stated it initially believed this document, and other documents, demonstrated

26

"intentional prosecutorial misconduct" but based on a totality of the evidence, the court concluded Wagner's statement was "if not inaccurate, at least seriously misleading." The court added that after hearing Wagner's testimony on this subject, it found him to be credible, i.e., that before the meeting he did not know of Perez's background, but that what he knew and what he should have known and should have done were very different things. The court stated "timely due diligence" would have revealed Perez had executed a formal CI agreement and had been working as a professional CI in the Orange County jail for over one year in exchange for express or implied anticipated benefits.

After again rejecting the DAs' excuses for failing to satisfy its discovery obligations, the court opined that based on the entire record, the DAs' "failures in this case" were significant negligence, not malicious, and constituted prosecutorial misconduct. The court added that it also considered whether the apparent misconduct in other cases was relevant to the misconduct in this case and amounted to outrageous government conduct but ultimately concluded it was not.

Citing in part to Krogman's attempt to obtain a new waiver from Dekraai, the trial court stated it could be argued the prosecutorial misconduct violated Dekraai's Sixth Amendment rights. The court opined the conduct was improper and concluded, based on the entire record, the misconduct was negligent and not malicious, noting there was no prejudice as the records remained under seal. The court concluded that when considered in its totality, the prosecutorial misconduct did not constitute outrageous government conduct requiring dismissal of the special circumstance Dekraai already admitted or the death penalty. Despite the court's finding the prosecution team did not engage in outrageous government conduct, it concluded a significant sanction was appropriate and prohibited prosecutors from using Dekraai's custodial statements during the penalty trial.

The trial court then turned to the motion to recuse the OCDA, incorporating the above findings. After discussing section 1424's two-part test, the court concluded

27

there was insufficient evidence the OCDA had a conflict of interest or that any conflict was so severe it disqualified the OCDA from prosecuting the penalty phase. The court added the following: "It is troubling that throughout this pending litigation additional materials that appear to have been subject to this court's January[] 2013 discovery order have continued to emerge from various sources. On the other hand, the court is aware that roughly 17,000 pages of discovery have been produced by the [DA] in response to that order. On balance, this court has not lost confidence that the duly elected [DA] of this county has the ability to competently and ethically complete the prosecution of this serious matter." The court denied Dekraai's motion to recuse the OCDA.

Finally, the trial court addressed Dekraai's *Massiah* motion. The court concluded there was significant evidence supporting the OCDA's concession, and the court accepted it. The court granted the *Massiah* motion and precluded prosecutors from using any of Dekraai's custodial statements during its penalty phase case-in-chief.

In conclusion, the trial court stated the evidence "in this case" established the prosecution team engaged in negligent prosecutorial misconduct requiring a significant sanction. The court opined many of the witnesses, including current and former prosecutors and sworn peace officers, "were credibility challenged." The court said some simply could not remember, but "[o]thers undoubtedly lied."

*Motion for Reconsideration*

Three months later, Dekraai filed a motion for reconsideration based on newly discovered evidence that Sanders obtained as a result of subpoenas in the Wozniak case.[12] The newly discovered evidence consisted of TRED records, OCSD's "dated computer entries that include the purported reasons for both jail housing movements and classification decisions." The OCDA initially opposed the motion to reconsider as did

---

[12]     County counsel produced the records in response to Sanders' subpoenas.

28

the Attorney General. Dekraai filed a reply, supported by Sanders' declaration. At a hearing, after the OCDA agreed, the trial court reopened the hearing.

*Second Evidentiary Hearing—February to March 2015*

Zachary Bieker testified he was an OCSD deputy sheriff assigned to the SHU from 2011 to 2013 and worked with Garcia and Grover. He explained housing decisions could be based in part on whether an inmate was a CI but there was no document or computer record that indicated whether an inmate was a CI. When Bieker was asked whether it would help if he had more time to think about it, he said, "No[.]"

When Bieker was asked what TRED records were, Bieker stated they are three-line computer entries regarding classification, interviews, separation orders, and housing movements. Bieker did not know what the acronym TRED meant, believed TRED records existed since the time the OC jail got computers, and first learned about TRED records when he worked in the classification unit. He stated supervisors, deputy sheriffs in the classification unit and the SHU, and some deputy sheriffs in housing have access to TRED records. Bieker made TRED entries on a daily basis and estimated he made thousands of entries. TRED records were the first place Bieker would look to determine why an inmate was moved.

Bieker had not received training on whether he could discuss TRED records in court. He added no supervisor ever told him that he could not discuss TRED records and he was not of the opinion they could only be discussed among SHU deputy sheriffs. He believed he could share TRED records with the OCDA or an investigating agency. Based on Dekraai's TRED records, Bieker "assum[ed]" nurse Trimmer moved Dekraai to sector 17, cell 3 without the SHU's approval because Dekraai's TRED records do not include any notation the SHU approved the move.

On cross-examination, Bieker testified the "common practice" was "TREDs weren't allowed in court[,]" but he did not know why. Bieker stated now that he knows TRED records were produced to Dekraai, he no longer thinks TRED records are

29

confidential. When the trial court questioned Bieker, he answered, "My understanding of the TRED was that they weren't allowed in court for whatever reason." He stated it was probably another deputy sheriff who told him that.

Tunstall testified that when he was part of the task force from January 2010 to October 2014 he was also a deputy sheriff in the SHU. Tunstall knew prior to his March 2013 meeting with the DA's office he was going to be asked about Dekraai's and Perez's housing and whether OCSD intentionally housed them near each other so Perez could obtain statements from Dekraai despite having previously disavowed any knowledge of OCSD documentation of inmate movements. Tunstall now explained that if he wanted to know why an inmate was moved, he would consult "the back portion" of the classification system, which was the TRED system, the best source of the information. Tunstall made "tens of thousands" of TRED entries.

Tunstall testified that when he was first assigned to the SHU in 2001 he was informally trained on the use of TRED records. Tunstall was taught TRED records, unlike housing records, are confidential because they contain sensitive information that could pose a threat to inmates. He was advised that if he was asked a question about TRED records while testifying he should invoke the privileges of Evidence Code sections 1040 and 1042 and request to speak with the judge in chambers with county counsel present. Tunstall claimed it did not occur to him to review TRED records before he testified even though he knew the reason why Dekraai and Perez were housed near each other was the critical issue. Tunstall agreed he was asked several questions about the reasons for the movement of several inmates and he often answered he did not know. Those questions did not cause Tunstall to think about checking TRED records.

Garcia testified he began working in the classification unit in 2005 and the SHU in 2008. Garcia first learned of and had access to the TRED system (he did not know what TRED stood for) when he began working in the classification unit. Garcia also made thousands of entries in the TRED system. Before his interview with the DA in

30

March 2013, he reviewed Dekraai's and Perez's housing and TRED records to determine why they were moved, who moved them, and when they were moved. Garcia agreed that at his October 2014 meeting with the DA he said his superiors instructed him to keep TRED records confidential. But he understood that if he was asked about TRED records while testifying to invoke the privileges of Evidence Code section 1040 and 1042.

Garcia reviewed the transcript of his previous testimony before testifying. He believed that during his first testimony he provided all the information required by the questions that were asked. Garcia admitted he was asked several questions about the reasons why inmates were moved and he often answered he did not know. Garcia provided different reasons why he never mentioned TRED records during his previous testimony, including he did not think PD Sanders asked him a question that required a reference to TRED, it did not occur to him TRED could have had the answer, and TRED records were confidential. When Garcia was asked whether prior to his initial testimony it occurred to him to tell the DA that TRED may contain helpful information, he said he did not know. Finally, in response to the trial court's questions, Garcia stated that when he first learned of and was given access to TRED, someone, a sergeant, told him they were confidential and not to discuss them.

Grover testified he previously worked in the classification unit and the SHU. Grover stated that from "day one in training" in 2002 he was told not to discuss TRED because it was an internal OCSD "secured data system" that had extremely sensitive information regarding inmates.

Jonathan Larson, an OCSD deputy sheriff, was assigned to the SHU from 2010 to 2012 and worked with Garcia and Grover. Larson said that when a CI provided him information, he documented the information in TRED. He learned about TRED during his first day of training in the classification unit like all deputy sheriffs in that unit because an inmate could not be classified without looking at TRED records. Larson would look at housing records to learn *when* an inmate was moved and TRED records to

31

determine *why* he was moved. He was never told he could not discuss TRED records outside the SHU. However, he was told that if he was questioned about TRED while testifying to invoke the privileges in Evidence Code section 1040 and 1042.

*Trial Court's Ruling on Motion for Reconsideration*

After the close of evidence, the trial court stated the parties could file written briefs. After the parties filed their briefs, there was a hearing where counsel offered final argument. The trial court issued its eight-page written ruling, portions of which it read into the record.

The trial court provided the procedural history of the case and "confirm[ed] its original findings and rulings" except as addressed in this supplemental ruling. The court stated the issue presented was whether supplemental evidence—evidence Tunstall and Garcia lied during the initial hearing—when considered with all the other evidence, established the prosecution team engaged in outrageous government conduct requiring additional sanctions and whether that evidence required the OCDA's recusal.

The trial court explained the initial hearing focused in part on whether OCSD deputy sheriffs placed Dekraai, who was represented by counsel, in a cell adjoining Perez, a CI, to obtain statements. The court explained that at the initial hearing, Tunstall and Garcia, SHU deputy sheriffs, both testified they were not involved in placing Dekraai next to Perez and feigned little knowledge of these events.

The trial court explained the evidence demonstrated that for at least 10 years, OCSD maintained a database in its jail records system known as TRED, which contained significant information about inmate housing movements. The court added the evidence established SHU deputy sheriffs accessed TRED on a daily basis. The court stated neither Tunstall nor Garcia ever mentioned TRED despite being asked questions "that should have logically triggered responses about" TRED. After detailing the inconsistencies in their testimony, the court concluded, "Tunstall and Garcia have either intentionally lied or willfully withheld material evidence from [the] court." The court said

32

the evidence established both Tunstall and Garcia were "thoroughly familiar" with TRED and made voluminous entries in TRED. The court added it did not believe Tunstall's, or DA Petersen's, testimony, blaming AUSA Flynn-Peister for discovery violations.

The trial court found deputy sheriffs Larson and Grover credible. The court opined their testimony conflicted with Tunstall's and Garcia's testimony and supported the conclusion SHU deputy sheriffs' duties included managing CIs and they were to never mention TRED. The court concluded both Tunstall and Garcia lacked credibility and intentionally withheld information about TRED at the initial hearing.

The trial court explained it was debatable whether the supplemental evidence demonstrated the prosecution team engaged in outrageous government conduct. The court said what was clear was that there were "serious, ongoing discovery violations" that required imposition of additional sanctions. Before imposing additional sanctions however, the court stated there was no evidence the OCDA knew of the TRED system until after the first hearing but that was not dispositive because for *Brady* purposes the DA had constructive knowledge of all information possessed by the prosecution team. The court opined the DA's failure to provide Dekraai with information concerning TRED for over two years in violation of the court's discovery orders was a significant discovery violation. As a sanction, the court ruled the prosecution's evidence during the penalty phase would be limited to the following: the circumstances of the offenses; Dekraai's pre-custodial statements; and victim impact statements.

Second, with respect to the recusal motion, the trial court stated "the evidentiary ground has now shifted." The court opined that based on the supplemental TRED evidence, evidence of prosecutorial misconduct in other cases was related to the prosecutorial misconduct in this case and the court had lost confidence the duly elected OCDA could fairly prosecute the penalty phase. The court added its concern regarding the discovery situation that it expressed in its first ruling was far worse because the

33

TRED database maintained by the OCSD for many years and containing information relevant to this case remained secret.

The trial court stated there was no evidence the DA "actively participated in the concealment of" TRED. The court found this to be particularly aggravating because "someone has to be in charge of criminal investigations and prosecutions in Orange County." The court reasoned as follows: "At times this may create a conflict of interest between prosecutors bound by their legal and ethical constraints and peace officers who may try to cut legal corners for the sake of expediency or some other purpose. The evidence indicates that such a conflict of interest exists in this case."

The court said the OCDA failed its responsibility to resolve the conflict of interest by protecting the rule of law and instead ignored OCSD's attempt to compromise Dekraai's constitutional and statutory rights. The court stated the OCDA was responsible for its agents' action and its agents ignored the law prejudicing Dekraai. The court characterized the DAs' conduct during this period as "benign neglect" preventing it from complying with the court's discovery orders. The court concluded, "The [OCDA] has a conflict of interest in this case which has actually deprived [Dekraai] of due process in the past. And given this ongoing conflict, the [OCDA's] continued participation in this prosecution will likely prevent [Dekraai] from receiving a fair trial in the future." The court granted Dekraai's recusal motion, not as a "punitive measure[]" to punish past prosecutorial misconduct but instead as a "remedial measure designed to insure that any future trial is fair."

In conclusion, the trial court stated the supplemental evidence established that when the DA presented false or intentionally misleading testimony, regardless of whether it was aware, it violated Dekraai's due process rights requiring additional sanctions detailed above. The court also stated the supplemental evidence established the DA in this case is unable to comply with its constitutional and statutory discovery obligations because of a conflict of interest and the conflict demonstrates the OCDA will

34

not ensure the prosecution team will comply with its discovery orders; the court noted that since its January 2013 discovery order, the DA had produced over 30,000 pages of discovery. The court concluded the conflict of interest required recusal of the OCDA and the Attorney General must prosecute the penalty phase.

## IV. Discussion

### A. *Section 1424*

Section 1424, subdivision (a)(1), provides, in relevant part, that a motion to recuse a prosecutor "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." Section 1424, subdivision (a)(1), "provides a two-part test: (1) whether there is a conflict of interest, and (2) whether the conflict is so severe as to disqualify the district attorney from acting. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 373 (*Bryant*).) "Section 1424's standards are 'prophylactic' [citation] and are designed 'to prevent potential constitutional violations from occurring' [citation]." (*People v. Trinh* (2014) 59 Cal.4th 216, 231 (*Trinh*); *Haraguchi, supra,* 43 Cal.4th at p. 712 [pretrial recusals prevent conflicts of interest that could lead to reversals].)

"Recusal of a prosecutor under section 1424 constitutes a statutorily authorized judicial interference with the executive branch's constitutional role to enforce the law. Accordingly, the decision whether to recuse must be carefully considered. '[R]ecusal of an entire prosecutorial office is a serious step, imposing a substantial burden on the People, and the Legislature and courts may reasonably insist upon a showing that such a step is necessary to assure a fair trial.' [Citation.]" (*Bryant, supra,* 60 Cal.4th at p. 374.) "If a defendant seeks to recuse an entire office, the record must demonstrate 'that the conduct of any deputy district attorney assigned to the case, or of the office as a whole, would likely be influenced by the personal interest of the district attorney or an employee.' [Citation.]" (*Id*. at p. 373.) Recusal of an entire prosecutorial

office is a "disfavored," "drastic" remedy and "there must be 'no other alternative available.'" (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1482.)

"We uniformly have held that a motion to recuse is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed only for an abuse of discretion. [Citations.] The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi, supra,* 43 Cal.4th at pp. 711-712, fns. omitted.) This standard is the same in capital cases. (*Hollywood, supra,* 43 Cal.4th at p. 728.)

*1. Conflict of Interest*

The first part of the test asks whether there is a reasonable possibility less than impartial treatment exists. "[A] court must determine whether a conflict exists, that is, whether 'the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citations.]" (*Haraguchi, supra,* 43 Cal.4th at p. 713.) A defendant's burden of establishing a genuine conflict "is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office. [Citations.]" (*Trinh, supra,* 59 Cal.4th at p. 229.)

"Even if specific prosecutors had engaged in misconduct, this behavior standing alone would not necessarily evince a likelihood that other prosecutors would exceed the bounds of proper advocacy. 'Our cases upholding recusal have generally identified a structural incentive for the prosecutor to elevate some other interest over the interest in impartial justice, should the two diverge.' [Citation.]" (*Bryant, supra,*

36

60 Cal.4th at p. 375.) Thus, we must determine whether there is a divided loyalty or structural incentive at odds with the OCDA's duty to prosecute Dekraai's penalty phase fairly. (See *People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 754.)

Here, the trial court explained that after hearing evidence OCSD secretly maintained the TRED database for over a decade and deputy sheriffs lied about it at the first evidentiary hearing, it concluded the misconduct *in other cases* was relevant to the misconduct in this case and "the discovery situation in this case is far worse than the court previously realized." The court stated that although there was "no direct evidence" the OCDA knew of TRED or "actively participated" in concealing TRED evidence, the OCDA was responsible for the actions of the prosecution team for *Brady* purposes. Based on the entire record, we conclude substantial evidence supported the trial court's conclusion OCDA had an actual conflict because its loyalty to OCSD prevented the OCDA from performing its constitutional and statutory obligations in this case.

Although we agree the evidence tends to establish it was coincidence Dekraai and Perez were housed next to each other, it is clear OCSD SHU deputy sheriffs operated a well-established program whereby they placed CIs, Perez and Moriel, next to targeted defendants who they knew were represented by counsel to obtain statements. Garcia's, Tunstall's, and Gallardo's testimony supports this conclusion. Although at the hearing Gallardo blamed Flynn-Peister for withholding discovery and claimed she approved moving inmates, at his earlier May 2013 interview he told Wagner that the *DA's office*, not Flynn-Peister, approved moving inmates. There was evidence Perez and Moriel requested and received from SHU deputy sheriffs fake documentation to enhance their credibility with targeted defendants. There was also evidence the prosecution team explicitly or implicitly promised consideration in exchange for information and Perez and Moriel expected a benefit.

Additionally, at the first hearing, Garcia and Tunstall both had the opportunity to discuss TRED records but failed to do so and during their subsequent

37

testimony both admitted they withheld information. For example, at the first hearing when Tunstall was asked whether there were any OCSD reports that documented inmate movements, he replied, "No, they wouldn't be. It would just be in the housing records." When Tunstall was asked how anyone would know an inmate was moved next to a CI, he answered, "I do not know that answer." However, at the second hearing, he testified TRED records were the best place to look to learn why an inmate was moved, he had made thousands of TRED entries, and he was trained TRED records were confidential.

At the first hearing, Garcia claimed he did not know why inmates were moved and stated he did not believe he ever wrote a report or documented he had moved CIs near inmates to obtain statements. At the second hearing, he admitted to making thousands of TRED entries. Garcia also admitted that before his March 2013 interview with the DA's office, he reviewed Dekraai's and Perez's housing and TRED records to determine why they were moved, who moved them, and when they were moved because he knew what he would be asked. Garcia provided a number of reasons why he never mentioned TRED during his initial testimony, including TRED records were confidential, the questions did not call for a reference to TRED records, and it did not occur to him TRED records could have had the answer. Needless to say, there was overwhelming evidence supporting the trial court's conclusion Garcia and Tunstall intentionally lied or willfully withheld information at the first hearing and they lacked credibility.

Throughout her briefs the Attorney General claims all the fault lies with the OCSD, and the OCDA is not to blame for the custodial CI program OCSD operated in the OC jails. In fact, the Attorney General asserts the OCSD "deceiv[ed]" the OCDA. But at oral argument, the Attorney General conceded the record includes no evidence the OCDA ever asked the OCSD questions that would have elicited information about the TRED database or TRED records. There is no legitimate reason for the OCSD to create and maintain such a sophisticated, synchronized, and well-documented CI program other than to obtain statements that will benefit prosecutions. Given the benefit the OCDA

38

received from OCSD's CI program over the years, it would not be unreasonable to conclude the OCDA was aware of the CI program and at the very least should have inquired about CIs housing and movements.

The evidence demonstrated DAs Wagner and Simmons received information from their investigator, Erickson, that Garcia reported Dekraai was confessing to Perez. Wagner and Simmons went to the jail and met with an informant who was interacting with a defendant who they knew was represented by counsel. Wagner, Simmons, and Erickson each admitted they knew there was jailhouse informant activity but before meeting Perez they did nothing to learn about his background. Garcia stated he could not remember whether he provided Wagner or Simmons any information about Perez's background as a CI. Erickson stated he "may have" previously spoken with Garcia about CIs and admitted that before the meeting he learned Perez had previously provided reliable information. Wagner admitted Perez said he questioned Dekraai. Similarly, Simmons stated that during the meeting he learned Perez asked Dekraai questions, but Simmons was not concerned because he did not believe Perez was acting on the government's behalf. Although both Wagner and Simmons knew Perez previously questioned Dekraai, they obtained and received approval from OCSD command staff to place a recording device in Dekraai's cell to obtain additional statements. Why would OCSD have any concerns about moving CIs to obtain statements from defendants represented by counsel when the DAs accepted the information without question and asked the OCSD for permission to obtain additional information?

Both Wagner and Simmons admitted they were aware Perez had initiated conversations with a represented defendant. This should have been a red flag for them. Rather than directly admonish Perez and educate the OCSD on *Massiah* principles, they simply asked deputy sheriff Garcia to remind Perez to not initiate any conversation with Dekraai. And about the same time as the Perez interview, another member of the prosecution team, detective Krogman, violated *Massiah* when he went to the jail and

39

attempted to have Dekraai sign another waiver. Wagner was not concerned with Krogman's conduct because he believed they are bound by "different ethics," but this is further evidence the DA failed to adequately direct the prosecution team to avoid constitutional violations.

After the meeting, Simmons did nothing to learn of Perez's background, and at least one year passed before he learned the extent of Perez's work as a CI. After the meeting, Wagner similarly failed to learn anything about Perez's criminal history or his work as a CI despite many opportunities to do so. In late 2011, Wagner approved Erickson's request to notify Perez's prosecutor that Perez provided information on Dekraai's case, but Wagner did not read the memorandum for almost two years. In the memorandum, Erickson wrote a "'covert investigation within the jail'" established Perez was providing reliable information. This of course was an indication Perez was acting on the government's behalf. Around the same time, Erickson wrote a report regarding the meeting with Perez but did not mention he was a CI. Wagner read this report a few months later but the fact there was no information about Perez's criminal history or his previous work as an informant did not raise any red flags. In April 2012, Wagner obtained Perez's rap sheet to determine if the OCPD had a conflict and learned Perez was facing a life sentence, but he did not contact Petersen. In June 2012, when Wagner asked Erickson which cases Perez was working as an informant and Erickson directed him to Petersen, Wagner did not follow up until January 2013, after Dekraai filed a formal request for discovery. Wagner finally obtained Perez's CI file in February 2013. After the March and May 2013 meetings where Wagner learned Perez obtained information from inmates unconnected to the Mexican Mafia investigation, Wagner did nothing to follow up. This evidence supports the conclusion that during this entire time period, prosecutors failed their professional responsibility to properly investigate Perez's CI work and produce the information to Dekraai.

Indeed, during their testimony, Wagner and Simmons conceded there was *Brady* material that should have been produced to Dekraai, but the most Wagner could admit to was "flawed" legal reasoning. In its first ruling, the trial court stated the prosecution had produced about 17,000 pages of material since its January 2013 order and in its second ruling stated the prosecution had produced more than 30,000 pages of material.[13] The Attorney General asserts the fact prosecutors produced the TRED records refutes the assertion it has a loyalty to protect the OCSD. But county counsel only produced these documents in response to Dekraai's subpoena, after PD Sanders learned of the records when he subpoenaed records in the Wozniak case. The OCDA had a duty to learn of the TRED database and disclose its records to Dekraai. (*People v. Williams* (2013) 58 Cal.4th 197, 256 [prosecution's *Brady* duty includes obligation "to ascertain" and disclose favorable evidence known to investigative agencies].)

There was a similar pattern of neglect on DA Petersen's part vis-à-vis his interaction with Moriel. Petersen knew Moriel was a federal CI, but he did not know the extent of his work and did not inquire further. Petersen stated that at the time of the Vega trial, he was only aware Moriel provided information regarding inmates Vega, Palacios, and Elizarraraz, and he did not investigate further. Petersen admitted he never asked Moriel or deputy sheriff Tunstall how Moriel came to be housed next to Vega. After Moriel testified he provided law enforcement with information regarding about 20 inmates, Petersen never inquired further. As with Wagner, Petersen admitted he failed to produce discovery to various defendants about Moriel's CI work and when he did provide discovery it was vastly different in different cases without any justification. Although this evidence did not concern Dekraai, the trial court did not err by concluding

---

13 And it appears OCSD found additional materials since the trial court's second ruling. On June 10, 2016, the Attorney General filed a letter brief stating the OCSD found an additional 1,157 pages of what it referred to as the "Special Handling Log.'"

41

it was relevant Evidence Code section 1101-type evidence that provided further support SHU deputy sheriffs operated a CI program to obtain statements from represented defendants and the OCDA's office was either explicitly or implicitly aware of it.

There are no published section 1424 cases addressing the type of conflict of interest the trial court identified here—a divided loyalty. Cases where conflicts of interest resulting in recusal of the entire district attorney's office generally fall into the following categories: institutional conflicts (*Bryant, supra,* 60 Cal.4th at p. 372 [infiltration of district attorney's office and delayed discovery]; *People v. Gamache* (2010) 48 Cal.4th 347, 364 [district attorney employee a victim] (*Gamache*); *People v. Vasquez* (2006) 39 Cal.4th 47, 55 [family relationship]; *People v. Snow* (2003) 30 Cal.4th 43, 85 [district attorneys testified at trial]; *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 830-832 [professional services relationship]; *People v. Zapien* (1993) 4 Cal.4th 929, 969 [district attorney's misconduct] (*Zapien*); *People v. Conner* (1983) 34 Cal.3d 141, 148 [district attorney witness and possible victim] (*Conner*); *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 270 [family relationship] (*Greer*)[14]; *Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1283-1284 [district attorney's office victim and potentially implicated in wrongdoing] (*Lewis*); *People v. Merritt* (1993) 19 Cal.App.4th 1573, 1579 [district attorney investigator misconduct] (*Merritt*), personal conflicts (*Trinh, supra,* 59 Cal.4th 216, 229-230 [district attorney's father recent patient at site of hospital shooting]), prior representation conflicts (*People v. Griffin* (2004) 33 Cal.4th 536, 568 [district attorney investigator previously defense investigator], overruled on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32 (*Riccardi*); and financial conflicts (*Eubanks, supra,* 14 Cal.4th at pp. 585-587 [crime victim provided district attorney financial resources to investigate crime]).

---

[14] The California Legislature enacted section 1424 in response to *Greer*. (*People v. Eubanks* (1996) 14 Cal.4th 580, 591 (*Eubanks*).)

A district attorney's impartiality may be impaired by institutional interests. (*Eubanks, supra,* 14 Cal.4th at p. 595.) Institutional interests and structural incentives like the one present here, a loyalty to protect, can be analogized to those cases where there was a familial relationship between the victim and the district attorney's office. In these cases, courts have concluded the district attorney could not exercise its discretion impartially. (*Gamache, supra,* 48 Cal.4th at pp. 362-363 [district attorney employee a victim]; *Conner, supra,* 34 Cal.3d at pp. 144-145 [deputy district attorney material witness and possible victim where deputy sheriff stabbed and shot]; *Greer, supra,* 19 Cal.3d at p. 259 [victim's mother discovery clerk in district attorney's office].)

Here, institutional interests and structural incentives between the OCDA and OCSD constituted a genuine conflict of interest. In Orange County, the OCSD is charged with investigating crimes, and the OCDA is charged with prosecuting those crimes.[15] In this case though, the evidence demonstrates the OCSD, in its secondary capacity as county jailer, created and maintained a CI program whereby it continued to investigate criminal activity in contravention of targeted defendants' constitutional rights. As we explain above, the only identifiable use for the evidence the OCSD obtained from its CI program was for use by the OCDA. The OCDA's loyalty to protect its primary law enforcement partner and its work interfered with its professional and ethical responsibilities. Here, the OCDA's loyalty to the OCSD interfered with its ability to discharge its constitutional and statutory obligations. Not only did the OCDA intentionally or negligently ignore the OCSD's violations of targeted defendants' constitutional rights, but the OCDA on its own violated targeted defendants' constitutional rights through its participation in the CI program.

---

[15]    Rackauckas, the Orange County District Attorney, and Sandra Hutchens, the Orange County Sheriff, are the only countywide elected officials in the Orange County criminal justice community.

*Lewis, supra,* 53 Cal.App.4th 1277, a decision from this court, is instructive. In *Lewis,* petitioner was Orange County's auditor-controller. Following OC's bankruptcy, a proceeding was brought to remove him from office for willful misconduct. (*Id.* at p. 1280.) The *Lewis* court issued a writ of mandate directing the trial court to vacate its order denying petitioner's motion to recuse the district attorney and enter a new order granting the motion. (*Id.* at pp. 1286-1287.) The court cited to a number of factors proving there was a genuine conflict, including petitioner continued to act as auditor of county departments, the district attorney was a victim, and as relevant here, the district attorney was implicated in the alleged conduct that caused OC's financial ruin. (*Id.* at pp. 1283-1285.)

As in *Lewis*, the OCDA was implicated in the misconduct. As we explain above, there was sufficient evidence the OCDA was not only aware the OCSD maintained a CI program where it moved CIs near targeted represented defendants to obtain statements but that it also failed on many occasions to produce information, or provided incomplete information, to defendants about the CIs who were obtaining the information. Contrary to the Attorney General's attempts to lay all the blame on the OCSD, the OCDA was complicit in the wrongdoing—DAs Wagner and Simmons knew Perez questioned Dekraai, who was represented by counsel, and then obtained OCSD approval to place a recording device in Dekraai's cell for Perez to obtain additional statements. And Wagner reported to Rackauckas and Tanizaki that DA's had been accused of wrongdoing within weeks of PD Sanders filing the defense motions. The OCDA's public response was to simply dismiss the serious allegations in the motions as "part of their litigation strategy" and "delay tactics." Thus, we conclude substantial evidence supports the trial court's conclusion there was a genuine conflict of interest— the OCDA's loyalty to the OCSD conflicted with its duty to the rule of law and its duty to fairly prosecute the case against Dekraai.

44

*2. Gravity of Any Conflict*

The second part of the test asks whether the conflict is so great it is more likely than not the DA will treat the defendant unfairly during some portion of the criminal proceedings. Thus, "[i]f . . . a conflict exists, the court must further determine whether the conflict is ""'so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.'"" [Citation.]" (*Haraguchi, supra,* 43 Cal.4th at p. 713.) The potential for unfair treatment must be "'real, not merely apparent,'" and likely result in unfairness. (*Bryant, supra,* 60 Cal.4th at p. 373.)

"Section 1424 'does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' [Citations.] Only an *actual likelihood of unfair treatment*, not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi, supra,* 43 Cal.4th at p. 719.)

"The protection of prosecutorial impartiality is, of course, a major purpose of the court's recusal power. [Citation.] *Even under section 1424, it may be appropriate to recuse an entire district attorney's office when there is substantial evidence that a deputy's animosity toward the accused may affect his colleagues.* [Citation.] Recusal may be denied, however, when the evidence of personal animus or bias is slight and does not amount to a reasonable possibility of unfairness. [Citations.]" (*Hamilton, supra,* 46 Cal.3d at p. 140, italics added, overruled on other grounds in *Eubanks, supra,* 14 Cal.4th 580; *People v. Alcocer* (1991) 230 Cal.App.3d 406, 414 [same].)

"Recusal is not a mechanism to punish past prosecutorial misconduct. Instead, it is employed if necessary to ensure that *future* proceedings will be fair. '[S]ection 1424 does not exist as a free-form vehicle through which to express judicial

45

condemnation of distasteful, or even improper, prosecutorial actions.' [Citation.]" (*Bryant, supra,* 60 Cal.4th at p. 375.)

Here, there was substantial evidence the OCDA's conflict of interest was so grave it was unlikely Dekraai would receive a fair penalty hearing. In reaching this conclusion, the trial court relied in part on the fact that despite its January 2013 discovery order, the OCDA failed to ensure OCSD complied with that order as evidenced by the continuous production of documents. In its first ruling, the court stated that from January 2013 to August 2014, the OCDA produced approximately 17,000 pages of discovery. The court's second ruling demonstrates that in the eight months since its first ruling, the OCDA had produced an additional 13,000 pages of discovery. As we note above, a few months ago, the Attorney General notified this court OCSD found an additional 1,157 pages of what it referred to as the "'Special Handling Log.'" This evidence supports the court's conclusion the OCDA continues to fail to ensure the OCSD, its chief law enforcement partner, will comply with its constitutional and statutory obligations. Discovery is not complete, additional discovery decisions must be made, and the OCDA's past substantial discovery failures are evidence it cannot be relied upon to comply with its discovery obligations in this case moving forward.

Additionally, we conclude there is other uncontradicted evidence from OCDA employees that supports the court's conclusion the OCDA's conflict of interest was so grave it was unlikely Dekraai will receive a fair penalty hearing. (*Lewis, supra,* 53 Cal.App.4th at pp. 1282-1283 [remand to determine whether conflict of interest unnecessary because uncontradicted evidence demonstrates conflict exists].) Wagner admitted Tanizaki, his direct supervisor, and Rackauckas were aware of Dekraai's motions and some of the allegations. Wagner also admitted he made public comments the motion included "scurrilous allegations" and "untruths" before he had read the entire motion, which demonstrates he had prejudged its merits. He conceded that after he read the entire motion, he agreed there was some merit to PD Sanders' allegations concerning

46

the gang cases, but he would not make the same acknowledgement on the Dekraai case, despite the fact he previously testified he failed to produce all *Brady* material and the OCDA effectively conceded the *Massiah* motion. After conceding the *Massiah* motion, the OCDA stressed the concession was not an admission of wrongdoing because it was "arguable" *Massiah* was not violated. How could the trial court expect the OCDA to properly supervise OCSD and fairly prosecute the penalty phase when one of the DAs prosecuting Dekraai failed to acknowledge any wrongdoing on the prosecution team's part in the Dekraai case?

Additionally, Wagner agreed many people in the OCDA's office, including "many" in the 15-person homicide unit, were angry at Sanders because of his allegations. Wagner's admissions of animosity towards Sanders was sufficient evidence the animosity extended to the entire defense team. Schroeder, Rackauckas' chief of staff, publicly stated the motions were essentially meritless because Wagner, one of the best prosecutors in the office, said so. Based on this evidence, it is certainly reasonable to conclude the animosity towards the defense existed at the highest levels in the OCDA's office and permeated the entire office.

Contrary to the Attorney General's claim otherwise, this recusable conflict of interest is not based simply on prosecutorial misconduct, which courts have ruled is impermissible. (*Young v. United States ex rel. Vuitton et Fils S.A.* (1987) 481 U.S. 787, 807, fn. 18; see *Zapien, supra,* 4 Cal.4th at pp. 969-971.) No, the recusable conflict of interest, a divided loyalty, is based on the OCDA's intentional or negligent participation in a covert CI program to obtain statements from represented defendants in violation of their constitutional rights, and to withhold that information from those defendants in violation of their constitutional and statutory rights. The conflict here is "real," it is "grave," and goes well beyond simply "distasteful, or improper" prosecutorial actions. The trial court's recusal of the entire OCDA's office was a necessary step to ensure

47

Dekraai's personal right to a fair penalty trial. (See *Hamilton, supra,* 46 Cal.3d at p. 140 [deputy DAs' animosity may affect colleagues].)

In *Lewis, supra,* 53 Cal.App.4th at pages 1285-1286, after finding the district attorney's office had a conflict of interest because it was both victim and possible malfeasant, the court concluded the conflict of interest was so grave that it was unlikely the auditor-controller would get a fair trial. Here, like in *Lewis*, the OCDA's office was implicated in the wrongdoing and there was sufficient evidence the animosity towards PD Sanders permeated the entire OCDA's office.

The Attorney General raises a number of contentions as to why the trial court erred by concluding the OCDA's conflict of interest was so severe it could not fairly prosecute Dekraai's penalty phase. First, the Attorney General argues the court's evidentiary sanctions eliminated any potential prejudice to Dekraai during the penalty phase. Although we agree the court's evidentiary sanctions cure the OCDA's and OCSD's *past* misconduct, the court's evidentiary sanctions do not ensure *moving forward* Dekraai will receive a fair penalty phase. In its first ruling, the court ordered the prosecution could not use Dekraai's custodial statements during its case-in-chief. In its second ruling, the court ordered the only evidence the prosecution could use during the penalty phase was Dekraai's conduct on October 11, 2011, his pre-custodial statements, and victim impact testimony. Based on the extensive misconduct in the record, we disagree with the Attorney General it is "sheer speculation that law enforcement officials will continue to conceal information" when the OCDA has failed to and continues to fail to properly supervise OCSD. The court's evidentiary sanctions do not ensure that in the future the systemic failures of the OCDA and OCSD will not interfere with the defense's ability to present mitigating evidence. (§ 190.3 [detailing types of evidence admissible during penalty phase]; see *People v. Crew* (2003) 31 Cal.4th 822, 854 [evidence of conduct in jail admissible during penalty phase].) Additionally, although the trial court's current order would preclude evidence of Dekraai's bad conduct in jail, the court

48

indicated that it would reconsider its ruling in light of future evidence. Dekraai will remain in OCSD's custody and under its control throughout the penalty phase. That being the case, it remains unlikely that Dekraai will receive a fair penalty phase if the OCDA remains in control of the litigation.

The magnitude of the systemic problems cannot be overlooked. Wagner, a 20-year veteran of the OCDA and supervisor of the homicide unit, admitted his legal reasoning on a prosecutor's fundamental ethical obligations under *Massiah* was flawed. Simmons, a 24-year veteran of the office, explained his understanding of his ethical obligation was "evolving." This record does not support a finding there was a reasonable basis for the trial court to have confidence the OCDA will prevent future misconduct from occurring in this case.

Second, the Attorney General contends recusing the entire OCDA's office and requiring the Attorney General to prosecute the penalty phase "will not rectify the alleged problems in this case." The Attorney General adds that "[a]ny misconduct in this case, even if imputable to the OCDA, undeniably had its origins in the OCS[D]." The Attorney General asserts that because the OCDA is familiar with the OCSD and the issues in this case, the OCDA is "arguably better suited" to prosecute the penalty phase. We disagree. The record before us demonstrates that from the outset, the OCDA failed in its duty as the primary county prosecutor to supervise its prosecution team, specifically the OCSD, and ensure its prosecutors and its law enforcement team complied with its constitutional and statutory obligations. Moreover, isn't the Attorney General's claim true in every section 1424 case? In all counties the district attorney is more familiar with its law enforcement partners, and were we to accept that reasoning as a basis to reverse the trial court's order, we would essentially eviscerate section 1424's protections. Here it is arguable this familiarity and cozy relationship between the OCDA and the OCSD contributed to the problem.

49

The Attorney General also relies on *Bryant, supra,* 60 Cal.4th 335, and *Merritt, supra,* 19 Cal.App.4th 1573, to argue the evidence was insufficient to support the trial court's conclusion the OCDA could not fairly prosecute Dekraai's penalty phase.

In *Bryant, supra,* 60 Cal.4th at pages 371-372, defense counsel filed a pretrial motion to recuse the entire Los Angeles County District Attorney's Office (LADA) based on a failure to provide discovery regarding whether defendant's family's employees had infiltrated the LADA's office and the delayed disclosure of a deputy district attorney's unredacted interview notes. The LADA provided redacted copies of these notes, but the fact the notes had been redacted was not apparent from the copies. (*Id.* at p. 372.) After the trial court heard testimony from numerous LADA supervisors and deputies, it granted the recusal motion because supervisors had been involved in the intentional and deliberate withholding of evidence. (*Ibid.*) The court based its reasoning in part on the fact that during its review of the infiltration issue, the court questioned the prosecutors whether there was additional information it should be aware of but "[n]o one had mentioned the notes or the internal conflict." (*Ibid.*) The Attorney General appealed, the Court of Appeal reversed, and the California Supreme Court denied defendants' petitions for review. (*Id.* at pp. 373-374.) The LADA removed from the case the prosecutor who committed the alleged misconduct. (*Ibid.*) A jury convicted defendants of first degree murder, and the trial court sentenced them to death. (*Id.* at p. 352.)

On automatic appeal to the California Supreme Court, defendants argued, *inter alia,* a violation of section 1424 and their due process rights. (*Bryant, supra,* 60 Cal.4th at p. 372.) In rejecting defendants' argument the prosecutor's past actions required recusal, the court explained the purpose of recusal is to ensure future proceedings are fair and not to punish past prosecutorial misconduct. (*Id.* at pp. 374-375.) The court opined there was no evidence of a conflict of interest because the prosecutors in question were replaced and the evidence was produced to defendants. (*Id.* at p. 375.) The court also rejected defendants' contention that because several

50

supervisors were involved in the recusal issue, those same prosecutors would have supervisory power over any prosecutor who tried the case. (*Id.* at pp. 375-376.) The court opined, "Recusal is justified only when the prosecutor has 'an interest in the case extraneous to [his or her] official function.' [Citation.]" The *Bryant* court concluded defendants failed to establish the existence of an extraneous interest. (*Id.* at p. 376.)

*Bryant* is inapposite, and contrary to the Attorney General's assertion, it is not "a closer case than this one." We disagree the trial court's recusal order was punishment for *past* prosecutorial misconduct. The court said as much in its written ruling. The court recused the OCDA because of systemic problems within its office and the OCSD's office that demonstrated the OCDA had a divided loyalty between its duty to fairly prosecute cases and protecting the OCSD. Although we agree the trial court found that based on the state of the evidence the OCDA was not aware of TRED and did nothing to conceal its existence, the Attorney General admits the OCDA had constructive knowledge of TRED for *Brady* purposes. The fact the defense team now has Dekraai's and Perez's TRED records does not cure the systemic problem.

The Attorney General construes the trial court's supplemental ruling too narrowly to mean the court recused the OCDA only because of the TRED records and because the OCDA was unaware of the TRED records this case is similar to *Bryant*. The basis for the court's ruling was broader than TRED. The court stated after learning of the TRED records, "the evidentiary ground has now shifted[]" and the misconduct in the other cases was relevant to this case. The record established both Wagner and Simmons were aware Perez questioned Dekraai, and sanctioned this operation by obtaining OCSD's permission to place a recording device in Dekraai's cell. Unlike in *Bryant*, the OCDA did not remove the offending prosecutors. And here the evidence of other cases established the misconduct was significantly more pervasive than in *Bryant*.

In *Merritt, supra,* 19 Cal.App.4th at pages 1576-1577, defendant moved to recuse the entire LADA's office because an investigator committed misconduct. The

51

trial court granted the motion, explaining that although the prosecutors were blameless and the investigator "'sandbagged'" the prosecutors, the LADA would try to protect its office. (*Id*. at pp. 1577-1578.) The *Merritt* court reversed because all material originally withheld by the investigator had ultimately been provided, and because "effective alternative remedies existed with which to deal with the alleged misconduct other than the ultimate, drastic remedy of recusing the entire [LADA]." (*Id*. at p. 1581.)

*Merritt* is inapposite. As we explain above, the trial court's evidentiary sanctions cured the past misconduct but the trial court, when considering the systemic problems within both the OCDA's and OCSD's office, concluded recusal was necessary to ensure Dekraai would receive a fair penalty phase. Unlike in *Merritt*, the OCDA was not "sandbagged" as evidenced by their either explicit or implicit participation in the OCSD's CI program that continued to produce highly valuable information for use in prosecutions. Based on the entire record, we conclude the court's ruling there was a genuine conflict of interest that posed a grave danger the OCDA could not fairly prosecute the penalty phase was supported by substantial evidence. Thus, the court did not abuse is discretion in granting Dekraai's motion to recuse the entire OCDA's office because recusal of the entire office "[fell] within the permissible range of options set by" section 1424. (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089 ["scope of discretion . . . resides in particular law being applied"].)

## B. Due Process

"As a constitutional matter, . . . '[n]either [the California Supreme Court] nor the United States Supreme Court has delineated the limitations due process places on prosecutorial conflicts of interest.' [Citation.] Indeed, '[a]s . . . prosecutors [cannot] completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a . . . prosecutor's recusal might be unwise, if not impossible. The high court's approach to *judicial* conflicts generally leaves that line-drawing process to state disqualification

and disciplinary law, with only "the most extreme of cases" being recognized as constitutional violations. [Citation.] [¶] To show a due process violation arising from a *prosecutor's* conflicting interest should be more difficult than from a judge's, for the "rigid requirements" of adjudicative neutrality . . . do not apply to prosecutors.' [Citation.]" (*Bryant, supra,* 60 Cal.4th at pp. 373-374.) In other words, "Recusal is justified only when the prosecutor has 'an interest in the case extraneous to [his or her] official function.' [Citation.]" (*Id.* at p. 376)

The OCDA's primary function is to prosecute crimes in Orange County. In that capacity, it must exercise its vast discretion justly and fairly to ensure every defendant is treated fairly, regardless of the severity of the charged offenses. Here, the evidence demonstrated the OCDA had an interest extraneous to its official duties—its loyalty to the OCSD and its desire to protect the OCSD at the expense of Dekraai's constitutional and statutory rights. This abdication of the OCDA's fiduciary duty violated Dekraai's due process rights.

V. Disposition

The order is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.


53