Filed 9/29/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SINCERE POMAR,<br><br>        Defendant and Respondent. | A167241<br>(City & County of San Francisco Super. Ct. No. CT21005460) |
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STEVIE MITCHELL, et al.,<br><br>        Defendants and Respondents. | A167286<br>(City & County of San Francisco Super. Ct. Nos. CRI21005511, CRI21005527)<br><br>**ORDER MODIFYING OPINION. [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The opinion filed Sept. 13, 2023, is modified as follows:

The second sentence of section C. on page 11 shall be replaced with the following sentence:

This court consolidated the two appeals and granted Mitchell's unopposed motion for calendar preference.

1

This order does not effect a change in the judgment.

Defendant and respondent Stevie Mitchell's Application For Correction Of Error In Court's Opinion is granted.


Date_____          _____P.J.

A167241, A167286 / *People v. Pomar & Mitchell*

Trial Court:        City & County of San Francisco Superior Court

Trial Judges:       Christopher C. Hite & Loretta M. Giorgi

Counsel:

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Appellant.

Jennifer A. Mannix and Matthew Dale Alger, under appointments by the Court of Appeal, for Defendants and Respondents.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SINCERE POMAR,<br><br>        Defendant and Respondent. | A167241<br><br>(City & County of San Francisco Super. Ct. No. CT21005460) |
| THE PEOPLE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>STEVIE MITCHELL et al.,<br><br>        Defendants and Respondents. | A167286<br><br>(City & County of San Francisco Super. Ct. Nos. CRI21005511, CRI21005527) |

Brooke Jenkins, an assistant district attorney (ADA) at the time, left the San Francisco District Attorney's Office (Office) to join the campaign to recall Chesa Boudin, the then San Francisco District Attorney (District Attorney). Soon after leaving the Office, Jenkins spoke to a reporter about a homicide case being prosecuted by the Office in which the victim was her husband's cousin. In the resulting newspaper article, Jenkins criticized the

1

Office for its lax approach toward prosecuting the two alleged killers of her husband's cousin, defendants and respondents Stevie Mitchell and Sincere Pomar. Specifically, Jenkins faulted the Office for dropping felony gang charges against Mitchell and Pomar and for failing to detain Pomar for the murder of her husband's cousin—which she claimed allowed Pomar to commit additional crimes, including attempted murder, soon after his release. After Boudin was recalled, Jenkins became the District Attorney. The Office instituted an "ethical wall" to prevent Jenkins from influencing its prosecution of Mitchell and Pomar for the murder of her husband's cousin. Nonetheless, Mitchell and Pomar moved to disqualify the entire Office from that case pursuant to Penal Code section 1424.[1] Pomar also moved to disqualify the entire Office from his separate prosecution for the additional crimes mentioned by Jenkins in the newspaper article. The trial courts in both cases granted the recusal motions and disqualified the entire Office from prosecuting the cases. Plaintiff and appellant the People of the State of California (People) appeal from the recusal orders, contending both courts abused their discretion. We disagree and affirm.

## BACKGROUND

### A.

At approximately 11 p.m. on July 5, 2020, Jerome Mallory, Jr. (Mallory) was killed in a drive-by shooting. On the morning of July 6, 2020, Jenkins, an ADA in the Office's homicide unit at the time, sent an email to David Merin, the Assistant Chief District Attorney who managed the Office's homicide unit at the time. In the email, Jenkins informed Merin that Mallory, her husband's cousin, "was shot and killed in Hunter's Point

---

[1] All undesignated statutory references are to the Penal Code.

2

yesterday/last night." Jenkins explained that she knew Mallory "from being at many family gatherings together over the years." She then explained that she sent the email so she could "be walled off [from] any investigation" and so she would not be assigned to any case related to the Mallory killing (hereinafter, the Mallory case). Merin responded by email that same day, stating that Jenkins "will be walled off" and that he would make "sure" Jenkins could not "access the file etc."

Under the Office's written Conflict of Interest Policy (Policy), "[a]n employee with a conflict of interest shall be walled off from the case." The " 'ethical wall' between the employee and a case shall mean: [¶] 1) the employee with the conflict of interest is barred from having any official role in the case. [¶ . . . ¶] 3) The employee shall not use any channel afforded by his or her employment: [¶] a. To access information about the case; [¶] b. To affect or influence the handling or outcome of the case; or [¶] c. To communicate about the case in an official capacity. [¶] 4) Managers shall not assign any responsibility for a subject on the list to an employee with a conflict of interest for that subject. [¶] 5) ADAs and employees assigned to the investigation or prosecution shall not seek or solicit any information from the ADA with a conflict of interest about matters that may be privileged." The Policy also required that the employee with the conflict be prevented "from accessing case materials on Office systems with Office issued login credentials" and that the "Office case management system be configured to provide notifications about which employee is walled off from a case due to a conflict of interest."

In accordance with the Policy, Merin did not assign Jenkins to the Mallory case or "designate her for any official role in the case." He "also did

not discuss any confidential information with" Jenkins "about the case" or involve her "in any charging decision or handling of the case."

On September 2, 2020, Merin assigned Aaron Laycook, another ADA, to the Mallory case and informed him that Jenkins "was walled off from the case." As a result, Laycook did not "communicate with" Jenkins "about the case in any capacity" except as he "would any other victim family/next of kin." He also did not allow Jenkins "to have access to any information about the case." According to Laycook, Jenkins never "sought access to any information about the case from" him and never sent him any emails about the case. And to Laycook's knowledge, nobody else involved in the investigation and prosecution of the Mallory case spoke to Jenkins about the case.

Jenkins confirmed that she complied with the ethical wall in the Mallory case. For example, she "did not direct the investigation of" or "attempt to influence the prosecution of [that] case." She also never accessed any "files, paper or electronic, or investigative files" relating to the case and never discussed the case with anyone in the Office aside from her July 6, 2020 email to Merin.

On June 8, 2021, the Office filed a felony complaint against Mitchell and Pomar in the Mallory case. The complaint charged Mitchell and Pomar with: (1) the murder of Mallory in violation of section 187, subdivision (a) (count 1); (2) conspiracy to commit the murder of Mallory in violation of section 182, subdivision (a)(1) (count 2); (3) two counts of assault with a semiautomatic firearm in violation of section 245, subdivision (b) (counts 3 and 4); (4) discharging a firearm from a motor vehicle in violation of section 26100, subdivision (c) (count 5); (5) participation in a criminal street gang in violation of section 186.22, subdivision (a) (felony gang count) (count 6); and (6) carrying a loaded, unregistered firearm in public in violation of section

4

25850, subdivision (a) (counts 7 and 8). The complaint further alleged that Mitchell and Pomar: (1) personally and intentionally discharged a firearm, causing great bodily injury and death, in connection with counts 1, 2, and 5 (§ 12022.53, subd. (d)); (2) personally used a firearm in connection with counts 1 through 4, and 6 (§ 12022, subd. (a)); and (3) personally inflicted great bodily injury on Mallory in connection with counts 3 through 6 (§ 12022.7, subd. (a)).

On June 30, 2021, the Office filed an amended felony complaint (amended complaint), dismissing the felony gang count against Mitchell and Pomar. The amended complaint made no other changes.

Jenkins resigned from the Office on October 15, 2021, and joined the recall campaign against Boudin. Soon after, Jenkins spoke with a reporter from the San Francisco Chronicle (Chronicle), who wrote a lengthy article about Jenkins and her decision to resign and join the recall campaign.

Published by the Chronicle on October 24, 2021, the article discussed Jenkins's reasons for leaving the Office and joining the recall campaign. It began by observing that "this is personal for Jenkins" because her husband's family had been "devastated" by the death of Mallory. In the article, Jenkins accused Boudin of "prioritizing ideology and politics over the day-to-day handling of cases" and described the Office as " 'a sinking ship . . . like the Titanic' " that is " 'taking public safety along with it.' "

Jenkins also talked about the Mallory case. The article reported that Mallory, "[a]ccording to Jenkins," "was an innocent bystander in a gang dispute." Jenkins then criticized the Office for refusing to file "felony charges of gang conspiracy" against Mitchell and Pomar in the Mallory case. As the article explained, Jenkins "wanted those charges filed against [Mitchell and Pomar], seeing them as the only way for prosecutors to make a case."

5

Because the Office declined to pursue those gang charges due to Boudin's resistance, "Jenkins said she doubt[ed] the case w[ould] hold up in court."

Finally, Jenkins observed in the article that Pomar "allegedly injured a 13-year-old child in his car and, weeks later, allegedly committed attempted murder" soon after he was released from custody in the Mallory case. According to Jenkins, Pomar would not have committed those additional crimes "if he had been held on Mallory's murder."

San Francisco voters recalled Boudin on June 7, 2022. One month later, on July 7, 2022, San Francisco Mayor London Breed announced the appointment of Jenkins "as the Interim District Attorney to head the" Office.

As soon as he learned about Jenkins's appointment on July 7, Laycook contacted Merin "about what precautionary steps" the Office "could take immediately to ensure the preservation/renewal of the ethical wall between" Jenkins "and [the Mallory] case once she was sworn-in as District Attorney." That same day, Merin directed the Office's "IT Team and other staff to 'wall off' " Jenkins from the case.

At the request of the trial court, Laycook also contacted the Attorney General's Office (Attorney General) "about whether they would provide a letter to the court" on the need, if any, for recusals under section 1424. On July 8, 2022, the Attorney General sent a letter to the court, arguing that the " 'ethical wall' " instituted by the Office "negates any need for recusal." The letter did not, however, mention Jenkins's statements in the press about the Mallory case.

In a hearing on July 8, 2022, counsel for Mitchell invited the Office to recuse itself from the Mallory case. Laycook declined to do so on behalf of the Office.

On or about July 19, 2022, Merin asked the Attorney General to " 'assume prosecution of the [Mallory] case in' " the Office's place. The Attorney General sent a letter to the Office on July 22, 2022, declining to do so because "the ethical wall protocols . . . put into place from the inception of the case" are "appropriate, fully effective, and more than compliant with legal requirements." Once again, however, the Attorney General did not mention Jenkins's comments in the press about the case.

On July 15, 2022, Ana Gonzalez became "the Chief Assistant District Attorney" and the "Acting District Attorney for" the Mallory case.

On October 20, 2022, Mitchell and Pomar filed separate motions to disqualify the entire Office from the Mallory case pursuant to section 1424. The Attorney General opposed. The Office did not. Instead, it filed a response that simply recited the relevant procedural background.

The trial judge granted both motions on November 30, 2022, disqualifying the entire Office from the Mallory case. In support, the judge took judicial notice of "the following indisputable facts": (1) there was a recall campaign against Boudin; (2) Jenkins joined the recall campaign shortly after resigning from the Office "on or about" October 15, 2021; (3) Jenkins spoke to the Chronicle about the Mallory case on October 24, 2021 and spoke to the press about the recall campaign several other times; (4) San Francisco voters recalled Boudin on June 7, 2022; (5) Mayor Breed announced the appointment of Jenkins as the interim District Attorney on July 7, 2022; and (6) San Francisco voters elected Jenkins as the District Attorney on November 8, 2022. He also took judicial notice of the contents of the Chronicle article, including Jenkins's comments about the Mallory case. Finally, the judge took judicial notice of the many ADAs who have left the

7

Office since 2020, "either as firings, resignations or retirements," as well as their status as "at-will employee[s]."

Based on these facts, the trial judge concluded that Jenkins had a conflict of interest in the Mallory case due to her "familial relationship with the homicide victim." At the same time, he found that Jenkins "ha[d] not committed any ethical violations and was immediately conflicted out of the case," that Jenkins made her public statements about the Mallory case as "a private citizen"—and not "as a prosecutor with the" Office—and that the Office "appropriately raised an ethical wall that" Jenkins "respected."

After considering "the entire complex of facts," the trial judge further concluded that Jenkins's conflict rendered it unlikely that Mitchell and Pomar would receive a fair trial. In reaching this conclusion, the judge noted that "in some circumstances an ethical wall may be sufficient to sanitize the [O]ffice from the conflict with the elected district attorney." But he found that such a wall was not sufficient here because of comments made by Jenkins to the press "regarding the nature of the charging decision, including the need for gang charges, the weight of the evidence, and the likelihood of success on the prosecution as charged." In light of Jenkins's "statement[s] to the press regarding her theories and beliefs about how" the Mallory case "should be prosecuted" and the fact that she "holds the ultimate power to discipline, promote[,] and fire" ADAs, "including whomever makes a plea offer or takes the matter to trial," the judge found "a strong incentive to more aggressively prosecute" Mitchell and Pomar "in this case." Although he noted that the ADAs prosecuting the Mallory case had not committed any "ethical misconduct," he nonetheless found that "the ethical wall does not shield" them or any other ADA "from being influenced by" Jenkins's public statements about the case.

8

The Attorney General timely appealed from the order disqualifying the entire Office from the Mallory case (appeal no. A167286).  (§ 1424, subd. (a)(1).)

**B.**

On July 29, 2020, approximately three weeks after Mallory's death, a car was broken into, and bags with cash and clothing were stolen from that car.  When the police attempted to arrest Pomar in connection with the car break-in and theft, he escaped.  The police, however, discovered stolen cash and a firearm in the backpack of a four-year-old child.  On August 17, 2020, a gun fight broke out between two vehicles in a car chase.  During the gun fight, a bullet hit a pedestrian in the face.

In connection with the car break-in and gun fight, the Office filed a felony complaint against Pomar and Ravenell Young, III on June 4, 2021 (hereinafter, the Pomar/Young case), while Jenkins was still an ADA at the Office.[2]  The complaint charged Pomar with:  (1) two counts of attempted murder in violation of sections 664 and 187, subdivision (a) (counts 1 and 2); (2) three counts of assault with a semiautomatic firearm in violation of section 245, subdivision (b) (counts 3 through 5); (3) discharge of a firearm with gross negligence in violation of section 246.3, subdivision (a) (count 6); (4) shooting from a motor vehicle in violation of section 26100, subdivision (d) (count 7); (5) two counts of illegally possessing a firearm under the age of 30 in violation of section 29820, subdivision (b) (counts 8 and 14); (6) carrying a loaded, unregistered firearm in violation of section 25850, subdivision (a) (count 9); (7) attempted destruction of evidence in violation of sections 664 and 135 (count 10); (8) burglary in violation of section 459 (count 11);

---

[2] Young is not a party to this appeal.

(9) receiving or buying stolen property in violation of section 496, subdivision (a) (count 12); (10) resisting, obstructing, or delaying a peace officer in violation of section 148, subdivision (a)(1) (count 13); and (11) child endangerment in violation of section 273a, subdivision (a) (count 15). The complaint further alleged that Pomar: (1) personally and intentionally discharged a firearm in connection with counts 1 and 2 (§ 12022.53, subd. (c)); (2) personally used a firearm in connection with counts 3 through 7 (§ 12022.5, subd. (a)); (3) inflicted great bodily injury with the intent to do so as a result of discharging a firearm from a motor vehicle in connection with counts 3 through 7 (§ 12022.55); (4) inflicted great bodily injury in connection with counts 5 through 7 (§ 12022.7, subd. (a)); and (5) personally used a firearm in connection with count 6 (§ 1192.7, subd. (c)(8)).

The Office apparently did not wall off Jenkins from the Pomar/Young case. Based on Jenkins's "public comments" to the press "concerning" the Pomar/Young and Mallory cases, Pomar moved to recuse the entire Office from the Pomar/Young case under section 1424. The Attorney General opposed. The Office did not file an opposition or response.

A different trial judge granted Pomar's motion, disqualifying the entire Office from the Pomar/Young case. In support, the judge took judicial notice of the recusal ruling in the Mallory case and adopted the findings in that ruling. Although the judge acknowledged that Jenkins was not related to the victims in the Pomar/Young case, she noted that Jenkins made "specific" comments to the press about the Pomar/Young case and tied that case directly to the Mallory case. She also noted the similarities between the drive-by shooting in the Pomar/Young case and the drive-by shooting in the Mallory case. "[G]iven . . . [Jenkins's] public comments and [her] strong feelings about how to proceed in not only these types of cases generally, but

10

the case of [] Pomar specifically, and the fact that this case involves very similar conduct," the judge concluded that "walling-off" Jenkins was not "going to be sufficient."

The Attorney General timely appealed from the order disqualifying the entire Office from the Pomar/Young case (appeal no. A167241). (§ 1424, subd. (a)(1).)

## C.

The appeals stayed the recusal orders in both the Mallory and Pomar/Young cases. (§ 1424, subd. (a)(1).) This Court consolidated the two appeals and granted the People's unopposed motion for calendar preference.

## DISCUSSION

### A.

"[A] motion to recuse is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed only for an abuse of discretion. [Citations.] The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 (*Haraguchi*).)

### B.

Under section 1424, "[a] motion to recuse the district attorney 'may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' " (*People v. Bell* (2019) 7 Cal.5th 70, 97 (*Bell*), quoting § 1424, subd. (a)(1).) "The statute 'articulates a two-part test: "(i) is there a conflict of interest?

11

And (ii) is the conflict so severe as to disqualify the district attorney from acting?" ' " (*Haraguchi, supra*, 43 Cal.4th at p. 711.) The People concede there is a conflict of interest based on "Jenkins's relationship to one of the victims." Thus, the only issue in these two appeals is whether the trial courts in the Mallory and Pomar/Young cases abused their discretion in finding that the conflict was " ' "so grave as to render it unlikely that [Mitchell and Pomar] will receive fair treatment *during all portions of the criminal proceedings.*" ' " (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 (*Vasquez*).) We find they did not and affirm.

## 1.

For a conflict to be grave enough to warrant recusal under section 1424, "the potential for prejudice to the defendant—the likelihood that the defendant will not receive a fair trial—must be real, not merely apparent, and must rise to the level of a *likelihood* of unfairness." (*People v. Eubanks* (1996) 14 Cal.4th 580, 592 (*Eubanks*), italics in original.) This includes not only the conflict's effect on the trial itself; it includes the conflict's "effect on 'the [district attorney's] *discretionary powers exercised either before or after trial* (e.g., plea bargaining or sentencing recommendations).' " (*Id.* at p. 593, italics in original.)

Section 1424 "does not[, however,] allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*Eubanks, supra*, 14 Cal.4th at p. 592, italics in original.) "Only an *actual likelihood of unfair treatment*, not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi, supra*, 43 Cal.4th at p. 719,

12

italics in original.)  Mere speculation is not enough.  (*Spaccia v. Superior Court* (2012) 209 Cal.App.4th 93, 107–108.)

And "[w]here, as here, a defendant seeks to recuse not just an individual prosecutor but also an entire prosecuting office, he must make an 'especially persuasive' showing.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 361.)  "[T]he 'threshold necessary for recusing an entire office is higher than that for an individual prosecutor.' " (*Schumb v. Superior Court* (2021) 64 Cal.App.5th 973, 981 (*Schumb*).)  Indeed, "recusal of an entire prosecutorial office is a serious step, imposing a substantial burden on the People, and the Legislature and courts may reasonably insist upon a showing that such a step is necessary to assure a fair trial." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1156 (*Hamilton*).)

Recusal of an entire prosecuting office therefore requires a showing "that the conduct of any deputy district attorney assigned to the case, or of the office as a whole, would likely be influenced by the personal interest of the district attorney or an employee." (*Vasquez, supra*, 39 Cal.4th at p. 57.)  In other words, the "nature and magnitude" of the conflict must be "likely to put the prosecutor's discretionary decisionmaking [under] the influence" of the district attorney or employee. (*Eubanks, supra*, 14 Cal.4th at p. 599.)

As a result, the mere fact that the elected district attorney has a conflict of interest is not, by itself, sufficient to support disqualification of the entire office.  (See, e.g., *Bell, supra*, 7 Cal.5th at pp. 94–95, 97–98 [affirming denial of recusal motion even though the district attorney represented a material witness in the defendant's case before becoming the district attorney].)  Indeed, a close familial relationship between the district attorney and the victim of a crime may not warrant recusal of the entire office from that victim's case so long as the district attorney is adequately walled off

13

from it.  (See, e.g., *Melcher v. Superior Court* (2017) 10 Cal.App.5th 160, 163 (*Melcher*) [affirming denial of recusal motion even though "the victim of" the defendant's "alleged crime is the district attorney's husband"].)

But "[e]ven under section 1424, it may be appropriate to recuse an entire district attorney's office when there is substantial evidence that a deputy's animosity toward the accused may affect his colleagues." (*Hamilton, supra,* 46 Cal.3d at p. 140.)  This is especially so if the elected district attorney herself harbors that animosity because she has broad discretion to hire, fire, promote, and demote every attorney in her office.[3]  Indeed, attorneys serving under the district attorney cannot "be freed from real or perceived concerns as to what their boss wants.  The power to review, hire, and fire is a potent one." (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 853–854.)

Ultimately, "no one factor will compel disqualification in all cases." (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 834.)  Instead, "the entire complex of facts surrounding the conflict" must be considered. (*Eubanks, supra,* 14 Cal.4th at p. 599.)  This includes any familial relationship between the elected district attorney and the victim of the crime (see *People v. Dekraai* (2016) 5 Cal.App.5th 1110, 1145 [familial relationship

---

[3] (See *Schumb, supra,* 64 Cal.App.5th at p. 984 ["disqualifying the entire district attorney's office is appropriate to prevent any bias that could result from the fact" that the "prosecuting deputies are ultimately hired, evaluated, and promoted by" the district attorney]; *People v. Choi* (2000) 80 Cal.App.4th 476, 483 [acknowledging that "potential bias . . . might result from the fact that deputies are hired, evaluated and promoted by the district attorney"]; *People v. Lepe* (1985) 164 Cal.App.3d 685, 689 (*Lepe*) [district attorney's office cannot be sufficiently "sanitized" from the "influence[]" of the district attorney's conflict because he hires, evaluates, and promotes every deputy in the office].)

14

may prevent the district attorney from "exercis[ing] its discretion impartially"]) and any public statements made by the district attorney about the prosecution of that crime (see *People v. Lastra* (2022) 83 Cal.App.5th 816, 823–824 (*Lastra*) [affirming recusal of the entire district attorney's office based on statements made by the district attorney about the case in the media, Facebook posts, and fundraising letters]).

## 2.

After considering the entire complex of facts surrounding Jenkins's conflict in the Mallory case, we conclude that the trial court did not abuse its discretion in disqualifying the entire Office from that case.

The relevant facts are undisputed. Mallory, the victim, was the cousin of Jenkins's husband, and Jenkins regularly saw him at family gatherings. She believed he was an innocent bystander. And as she professed in the Chronicle article, her husband's family was "devastated" by Mallory's death.

Jenkins also harshly criticized the Office's handling of the Mallory case. For example, she denounced the Office's decision to release Pomar after he had been detained in the Mallory case because he allegedly committed additional crimes, including attempted murder, soon after his release. And Jenkins was especially critical of the Office's decision—which necessarily meant the decision of the ADAs prosecuting the case—to dismiss the felony gang count against Mitchell and Pomar. Indeed, she even went so far as to declare that the prosecution of Mitchell and Pomar for the Mallory murder would likely fail because the Office dropped that charge.

Notably, Jenkins made these critical remarks to the press in support of a highly publicized campaign to recall the district attorney at the time. Indeed, more than one newspaper published her criticisms of the Mallory

15

prosecution, including the Chronicle, the largest newspaper in Northern California.[4]

Finally, Jenkins, as the district attorney, has broad authority to hire, fire, promote, and demote any ADA involved in the prosecution of the Mallory case because they are at-will employees. And a significant number of ADAs in the Office had, in fact, been hired and fired since 2020.

These undisputed facts provide substantial evidence that Jenkins had a deep, personal interest in the Mallory case, believed in the guilt of Mitchell and Pomar, and harbored animosity toward them for their role in Mallory's death. They also provide substantial evidence that Jenkins disagreed with how the Office had been handling the case, including its charging decisions, and believed that Mitchell and Pomar should be prosecuted far more aggressively for their role in Mallory's death. And they provide substantial evidence that the ADAs in the Office, including the ADAs prosecuting the Mallory case, were aware of Jenkins's strong, personal interest in the case, her belief that the Office's lax approach toward prosecuting the case had already doomed it, and her broad authority over their hiring, firing, promotion, and demotion.

That Jenkins committed no ethical violations because she made her public statements about the Mallory case before she became District Attorney makes no difference. Those statements still reflect her personal beliefs and opinions. Thus, based on the evidence in the record, it was reasonable, and certainly not speculative, for the trial court to conclude that any "plea bargaining or sentencing recommendations" by the ADAs in the Office may be "*consciously or unconsciously* . . . affected [by Jenkins's conflict] to a degree

_____

[4] The Court, on its own motion, takes judicial notice of the size of the Chronicle's circulation in Northern California. (Evid. Code, § 452, subd. (g).)

rendering it unlikely that" Mitchell and Pomar "would receive a fair trial." (*People v. Conner* (1983) 34 Cal.3d 141, 149 (*Conner*), italics added.)

Accordingly, we find that the trial court did not abuse its discretion in recusing the entire Office from the Mallory case.

**3.**

Although the question is closer, we also find that the trial court did not abuse its discretion in disqualifying the entire Office from the Pomar/Young case. Jenkins did not have any relationship, familial or otherwise, to the victims in the Pomar/Young case. But she tied that case directly to the Mallory case through her statements to the press. As a result, the trial court reasonably concluded that Jenkins's animosity toward Pomar for his role in the drive-by shooting of her husband's cousin extended to his role in the drive-by shooting in the Pomar/Young case. The court also reasonably concluded that, due to Jenkins's public statements tying the two cases together, they had become inextricably intertwined in the eyes of the ADAs in the Office, as well as the public. Finally, the court reasonably concluded that Jenkins's belief that the prosecution of Pomar in the Mallory case was doomed due to the lack of gang charges would likely influence ADAs "consciously or unconsciously" to be more aggressive in prosecuting Pomar in the Pomar/Young case. (*Conner*, *supra*, 34 Cal.3d at p. 149.) Thus, we cannot conclude that the trial court abused its discretion in holding that Jenkins's conflict also rendered it unlikely that Pomar would receive a fair trial in the Pomar/Young case. (Cf. *Vasquez*, *supra*, 39 Cal.4th at p. 58 [extending recusal of district attorney's office to the defendant based on his co-defendant's "family relationship" to employees at the office].)

17

**4.**

The People make a number of arguments in support of reversal, but we do not find them persuasive.

First, the trial court did not abuse its discretion in finding that the Office's ethical wall did not sanitize the conflict in the Mallory case.[5] Although there was no evidence that the wall had been ineffective, some conflicts simply cannot "be sanitized such to assume the deputy who prosecutes the case will not be influenced by the considerations that bar [the district attorney herself] from participation in the case." (*Lepe, supra*, 164 Cal.App.3d at p. 689.) Given Jenkins's widely publicized statements about the Mallory case, including the nature, tenor, and context of those statements, we cannot conclude that the court abused its discretion in finding that this was one of those cases. Indeed, it is reasonable to assume that *any* ADA in the Office is likely to be influenced at some stage of the case—whether "consciously or unconsciously"—by Jenkins's strong, personal feelings about the need to prosecute the case more aggressively. (*Conner, supra*, 34 Cal.3d at p. 149.)

Second, the absence of evidence that any ADAs had treated Mitchell or Pomar differently due to Jenkins's conflict does not compel a contrary conclusion. "Section 1424's standards are 'prophylactic.' " (*People v. Trinh* (2014) 59 Cal.4th 216, 231 (*Trinh*).) Thus "the standard for disqualification does not require evidence that [the district attorney] actually directed, influenced, or pressured" the ADAs prosecuting the two cases. (*Schumb, supra*, 64 Cal.App.5th at p. 985.)

---

[5] There is no evidence in the record that the Office instituted an ethical wall for Jenkins in the Pomar/Young case.

Third, the fact that elected district attorneys often make "public statements about particular cases" does not help the People here. The public statements made by Jenkins about the Mallory and Pomar/Young cases are qualitatively and substantively different from the public statements typically made by district attorneys about a particular case. For example, district attorneys do not typically emphasize their own close and personal connection to a particular case as Jenkins did here. More notably, district attorneys do not typically criticize how their ADAs are prosecuting a particular case as Jenkins did here. Indeed, most district attorneys presumably do not ever state, much less suggest, that their prosecution of a case is doomed by their charging decisions as Jenkins did here. In any event, the trial court is "best positioned to determine" whether Jenkins's public statements were likely to deprive Mitchell and Pomar of a fair trial, and we will not "substitute our judgment for that of a trial court familiar with the social, legal, and political dynamics of" San Francisco. (*Lastra*, *supra*, 83 Cal.App.5th at p. 823.)

Fourth, the People's claim that the trial court improperly relied upon the Office's desire to have "another . . . prosecute the case" is unfounded. The court merely cited the Office's failure to oppose the recusal motion as one of four reasons why *Melcher*, *supra*, 10 Cal.App.5th 160, was "distinguishable from our present situation." Even if that distinction is not relevant, it does not establish that the court considered an improper factor in granting the recusal motions. Indeed, there is nothing in the record to suggest that the court relied upon the Office's lack of opposition as evidence that ADAs "were reasonably likely to be improperly influenced by Jenkins's statements about the case."

Finally, the cases that the People rely heavily upon are inapposite. Neither *Bell*, *supra*, 7 Cal.5th 70, nor *People v. Petrisca* (2006) 138

19

Cal.App.4th 189 (*Petrisca*), involved the conflict of an elected district attorney with broad authority to fire, hire, promote, and demote the ADAs prosecuting the case. Nor did *Bell* or *Petrisca* consider statements by that district attorney that were widely disseminated in the press, that emphasized the district attorney's strong, personal interest in the case, and that criticized the the Office for its failure to aggressively prosecute the case. Finally, both *Bell* and *Petrisca* involved appeals from orders *denying* recusal.

That last distinction is especially significant here. The trial courts in the Mallory and Pomar/Young cases could have reasonably concluded that Jenkins's conflict was insufficient to support recusal under section 1424. But they did not. (See *Haraguchi*, *supra*, 43 Cal.4th at p. 717 [it "would not have been an abuse of discretion for the trial court" either to grant or deny the recusal motion under the facts of the case].) As our high court has recognized, "trial courts are in a better position than appellate courts to assess witness credibility, make findings of fact, and evaluate the consequences of a potential conflict in light of the entirety of a case, a case they inevitably will be more familiar with than the appellate courts that may subsequently encounter the case in the context of a few briefs, a few minutes of oral argument, and a cold and often limited record." (*Id.* at p. 713.) Because there is more than enough "credible evidence" to support the courts' findings in these two cases, "our review is at an end." (*Trinh*, *supra*, 59 Cal.4th at p. 231.)

## DISPOSITION

The recusal orders in the Mallory (A67286) and Pomar/Young (A167241) cases are affirmed.

20

_____

CHOU, J.

We concur.

_____

JACKSON, P. J.

_____

BURNS, J.

*People v. Pomar & Mitchell* / A167241, A167286,

A167241, A167286 / *People v. Pomar & Mitchell*

Trial Court:  City & County of San Francisco Superior Court

Trial Judges:  Christopher C. Hite & Loretta M. Giorgi

Counsel: Jennifer A. Mannix & Matthew Dale Alger, By Appointment of the First District court of Appeal under the First District Appellate Project, for Defendants and Respondents.

Rob Bonta, Attorney General of California; Lance E. Winters, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Seth K. Schalit, Supervising Deputy Attorney General; Bridget Billeter, Deputy Attorney General for Plaintiff and Appellant.